Filed 11/29/17
# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| QDOS, INC., | B279475 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC566521) |
| v. | |
| SIGNATURE FINANCIAL, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Rita Miller and Victor Chavez, Judges. Affirmed.

Law Offices of Damian D. Capozzola, Damian D. Capozzola and Timothy R. Laquer for Plaintiff and Appellant.

Kolar & Associates, Elizabeth L. Kolar & Benjamin T. Runge for Defendants and Respondents.

\* \* \* \* \* \*

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, only the Factual and Procedural Background, Part I of the Discussion, and the Disposition are certified for publication.

A bank or merchant has a common law duty, when conducting a transaction with its customer that also involves a third party, (1) not to ignore "red flags" or "suspicious" circumstances that may indicate the third party is being defrauded, and in that instance (2) not to proceed with the transaction without doing some investigation. (E.g., *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 693 (*Sun 'n Sand*), superseded on other grounds by Cal. U. Com. Code, § 3404; *Burns v. Neiman Marcus Group, Inc.* (2009) 173 Cal.App.4th 479, 489 (*Burns*).) Can the third party sue a merchant for negligence in breaching these duties when the merchant sells a high-end sports car to its customer and the customer pays for most of the car with two checks the third party made out to the merchant? In other words, is a customer's payment with a check not in the customer's own name, by itself, a red flag? We conclude the answer is "no," and affirm the trial court's grant of summary adjudication dismissing the third party's negligence and related claims against the merchant. In the unpublished portion of our decision, we further conclude that the trial court did not err (1) in excluding evidence of the merchant's alleged negligence during the trial against the car's current owners to declare who owns the car, and (2) in declining to award punitive damages against the merchant's customer after a default judgment was entered against him. Accordingly, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

Plaintiff and appellant QDOS, Inc. (QDOS) is in the business of offering team-specific, sports-related content over the

Internet and on mobile devices. QDOS does business as "DeskSite." Richard Gillam (Gillam) is DeskSite's CEO.

In early 2011, DeskSite asked Fazliq Dean Kader (Kader) to raise funds for its business, although DeskSite never hired him as an employee. In late 2011, Kader secured a $3 million investment.

In December 2011, Kader approached Gillam with a "unique business proposal"—namely, DeskSite would put up the money to buy a 2012 Lamborghini Aventador and then immediately resell the car for a profit of at least $200,000, and the profit would be deemed additional fundraising revenue for DeskSite. Kader suggested buying the car from The Auto Gallery, which was operated by defendant and respondent Motorcars West, LLC. Kader was one of The Auto Gallery's "preexisting client[s]," and Kader had previously told The Auto Gallery's employees that he owned "hundreds of companies." Gillam agreed to the proposal. Because Gillam "trusted" Kader, Gillam did not at that time put anything in writing and just orally told Kader to vest title to the car in DeskSite's name. The exact nature of DeskSite's funding of the car purchase was disputed by Gillam himself: Contemporaneously, he referred to the money used to buy the car as a "loan," but after litigation started, said it was "not . . . a loan."

Gillam and Kader moved forward with their plan. Kader put down a $15,000 deposit using his own personal check. Gillam then authorized two checks drawn on QDOS/DeskSite's account to be made out to The Auto Gallery—the first for $300,000, and the second for $216,000—and then Gillam signed those checks. In the memo line, both checks noted "Auto DKL," which Gillam said stood in part for "Dean Kader." Consistent with Kader's

3

statements to The Auto Gallery that he owned QDOS and that he would be buying the car with company checks, Kader personally handed both QDOS/DeskSite checks to The Auto Gallery's employees. Kader did not give The Auto Gallery any QDOS/DeskSite business cards or letterhead with his name on it. However, at no point during this transaction did QDOS/DeskSite contact The Auto Gallery directly or otherwise instruct The Auto Gallery to place title to the car in its name or to place a lien on the car in its favor. Because The Auto Gallery received no special instructions and had received payment in full, in December 2011, it placed title to the car in the name of Kader and his wife and listed no liens.

In July 2012, Kader sold the car back to The Auto Gallery for $428,111 and a trade-in car. Two weeks later, The Auto Gallery sold the car to defendant and respondent Premier Financial Services, LLC (Premier), who financed its purchase with a loan from defendant and respondent Signature Financial, LLC (Signature). Premier then leased the car to defendant and respondent Rick Jenkins, M.D., Inc. (Jenkins).

II.    **Procedural Background**

    A.    **QDOS/DeskSite's Operative Complaint**

In the operative first amended complaint, DeskSite sued Kader, The Auto Gallery, Premier, Signature, and Jenkins. Specifically, DeskSite sued Kader for (1) breach of contract, (2) breach of fiduciary duty, (3) fraud, (4) fraudulent concealment, (5) conversion (of the car), and (6) conversion (of an additional $150,000 that DeskSite loaned Kader so Kader could obtain a loan to pay off DeskSite's $516,000 investment in the car). DeskSite sued The Auto Gallery for (1) aiding and abetting Kader's breach of fiduciary duty, (2) aiding and abetting Kader's

4

fraud, (3) aiding and abetting Kader's fraudulent concealment, (4) aiding and abetting Kader's conversion of the car, and (5) negligence. All of the those claims were premised on The Auto Gallery's conduct in "helping" Kader with the transaction and/or not investigating why Kader was paying with QDOS/DeskSite's checks. DeskSite sued Premier, Signature, and Jenkins for declaratory relief—specifically, a declaration that DeskSite's title to the car was superior to theirs.[1]

### B.     Kader's Default

Kader did not respond to DeskSite's operative complaint, and the trial court entered a default against him.

### C.     Motion for Summary Adjudication

The Auto Gallery, Premier, Signature, and Jenkins filed a motion for summary judgment and/or summary adjudication. After full briefing and a hearing, the trial court granted summary adjudication as to all five claims against The Auto Gallery, but denied summary adjudication as to the declaratory relief claim against Premier, Signature, and Jenkins (collectively, the remaining defendants). With regard to the claims against The Auto Gallery, the court ruled that The Auto Gallery had no "legal duty to [DeskSite] to investigat[e] whether Kader's statements to [The] Auto Gallery were true." Specifically, the court rejected the notion that "every car dealer has to check to make sure the name on the check exactly matches the name on the title" because such

---

[1]     The Auto Gallery, Premier, Signature, and Jenkins filed a counter-complaint against DeskSite, but the trial court sustained DeskSite's demurrer to that counter-complaint without leave to amend, and that ruling was never appealed. The Auto Gallery, Premier, Signature, and Jenkins also filed a cross-complaint against Kader for implied indemnity, apportionment of fault, and declaratory relief; that action is also not before us on appeal.

a rule would create "a new burden . . . that . . . would throw . . . any other business where [a merchant is] selling things or, at least, large price tagged things into total disarray." With regard to the declaratory relief claim, the court found that the remaining defendants had "failed to meet their burden" of showing entitlement to summary adjudication.

###### D. Trial on Declaratory Relief Claim

In anticipation of the trial on DeskSite's declaratory relief claim, the remaining defendants filed motions in limine to exclude evidence regarding (1) any alleged negligence by The Auto Gallery, and (2) DeskSite's claims against The Auto Gallery. The trial court granted both motions. At the hearing on the motions, DeskSite acknowledged that the question whether The Auto Gallery was negligent and the question whether Kader was a "thief" incapable of passing title (hence entitling DeskSite to declaratory relief) were "totally separate questions," but nevertheless urged that "one could inform the other." The trial court was unpersuaded, ruling that it would not "allow testimony about [The] Auto Gallery [because] [t]hey're not" in the case.

After a multi-day trial, a jury returned a special verdict in favor of the remaining defendants. Specifically, the jury found that (1) Kader did not commit theft;[2] (2) Kader had the "apparent authority to buy the [car] with title in his own name"; and (3) the remaining defendants were "bona fide purchasers for value."

---

[2] DeskSite subsequently asked the court to "clarify" that the jury's special verdict pertained only to Kader's theft of the car (rather than the $150,000 DeskSite loaned him to buy back the car), but the trial court denied the motion.

6

## E. Default Judgment Against Kader

Several weeks after the jury returned its verdict, the trial court held a hearing for DeskSite to prove up its damages against Kader. In the proposed default judgment it lodged with the court, DeskSite sought $901,098 in compensatory damages and an equal amount in punitive damages. At the conclusion of the hearing, the trial court ruled that DeskSite had proven up $901,098 in compensatory damages, but declined to award any punitive damages. DeskSite introduced evidence that Kader was involved with one "active" corporation and two expired corporations; that he was renting an "extremely opulent house"; that he had bought an Audi for his wife at The Auto Gallery at some point; and that he "maintains a flamboyant lifestyle." However, DeskSite was "not able to come up with any assets" owned by Kader. This was consistent with DeskSite's prior representations to the court that it thought it was "unlikely that . . . Kader has assets." What DeskSite offered was its investigator's opinion that "[s]ince [the investigator] was not able to find any such assets, . . . Kader has employed methods to prevent his assets from being located and traced to him." The trial court found this showing to be insufficient: "You got no evidence. All you are giving me is rhetoric. I have to hear evidence of some net worth, and I haven't heard it."

## F. Judgment and Appeal

Following the trial court's entry of judgment, DeskSite filed this timely appeal.

## DISCUSSION

DeskSite raises three challenges to the trial court's judgment, arguing that the trial court (1) erred in concluding that The Auto Gallery owed it no duty, and thus in granting summary

7

adjudication to The Auto Gallery, (2) erred in granting the motions in limine excluding evidence of The Auto Gallery's alleged negligence during the remaining defendants' declaratory relief trial, and (3) erred in awarding no punitive damages against Kader after the default prove-up hearing. We discuss each challenge in turn.

## I.     Merchant's Duty To Investigate

Summary adjudication, like summary judgment, is appropriate when the moving party shows "[it] is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)) because, among other things, the nonmoving party (here, DeskSite) cannot establish "[o]ne or more of the elements of [its] cause of action" (Code Civ. Proc., § 437c, subd. (*o*)(1); see *id.*, subd. (p)(2)). (*Tustin Field Gas & Food, Inc. v. Mid-Century Ins. Co.* (2017) 13 Cal.App.5th 220, 226; *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1031 [summary adjudication is "'procedurally identical to [a] motion[] for summary judgment . . .'"].) "'"[T]he existence of a duty"'" of care running from the defendant to the plaintiff is "'"*[t]he* threshold element of a cause of action for negligence."'" (*Paz v. State of California* (2002) 22 Cal.4th 550, 559, italics added.) Because DeskSite does not argue that The Auto Gallery *knew* of Kader's fraudulent misuse of DeskSite's money, the viability of DeskSite's negligence as well as aiding and abetting-based claims against The Auto Gallery turns solely on whether The Auto Gallery unreasonably failed to uncover Kader's fraud and hence on whether The Auto Gallery had a duty to investigate. Whether a duty of care exists is a question of law for our independent review. (*Quelimane Co v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57 (*Quelimane*).) We also

8

independently review a trial court's grant of summary adjudication. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273.)

"The general rule in California is that '[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . .'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*), quoting Civ. Code, § 1714, subd. (a).) In the business context, however, "[r]ecognition of a duty [under negligence law] to manage business affairs so as to prevent purely economic loss to third parties in their financial transactions is the exception, not the rule." (*Quelimane, supra,* 19 Cal.4th at p. 58; *Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 715 (*Summit Financial*).) Whether a court will nevertheless recognize such a duty does not turn on privity of contract. (*Centinela Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016) 1 Cal.5th 994, 1013 (*Centinela Freeman*); *Quelimane*, at p. 58.) Instead, it turns on whether "'public policy . . . dictate[s] the existence of a duty to third parties.'" (*Centinela Freeman*, at p. 1013; *Cabral*, at p. 771 ["courts should create [a duty] only where 'clearly supported by public policy'"].)

To assess whether public policy dictates the recognition of a duty of care, courts "balanc[e] . . . a number of policy considerations." (*Sun 'n Sand, supra,* 21 Cal.3d at p. 695.) The considerations most relevant in the "business context" are set forth in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*). (See *Centinela Freeman, supra,* 1 Cal.5th at pp. 1013-1014; *Summit Financial, supra,* 27 Cal.4th at p. 715; *Quelimane, supra,*

9

19 Cal.4th at p. 58.)  The *Biakanja* considerations are:  (1) "the extent to which the transaction was intended to affect the plaintiff," (2) "the foreseeability of harm to [the plaintiff]," (3) "the degree of certainty that the plaintiff suffered injury," (4) "the closeness of the connection between the defendant's conduct and the injury suffered," (5) "the moral blame attached to the defendant's conduct," and (6) "the policy of preventing future harm."  (*Biakanja*, at p. 650.)  Among these factors, foreseeability is the """chief factor"""" (*Pedeferri v. Seidner Enterprises* (2013) 216 Cal.App.4th 359, 366 (*Pedeferri*)), but "[f]oreseeability of financial injury to third persons alone is not a basis for imposition of liability for negligent conduct" (*Quelimane*, at p. 58; *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 399).

The *Biakanja* considerations are similar to, but not identical with, the policy considerations set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) that bear on the recognition of a duty of care among persons not parties to a business or financial transaction.  *Rowland* enumerates seven considerations:  The first five *Rowland* considerations are identical to second through sixth *Biakanja* considerations.  (See *Rowland*, at pp. 112-113.)  Where the list of considerations differs is that (1) *Rowland* does not consider "the extent to which the transaction was intended to affect the plaintiff" (because there is no transaction), and (2) *Rowland* adds two further considerations that flesh out "the policy of preventing future harm" consideration—namely, (a) "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach," and (b) "the availability, cost, and prevalence of insurance for the risk involved."  (*Rowland*, at p. 113.)  Whether a court uses the

*Biakanja* factors, the *Rowland* factors, or an amalgamation of both, the "factors are evaluated at a relatively broad level of factual generality." (*Cabral*, *supra*, 51 Cal.4th at p. 772; *Ballard v. Uribe* (1986) 41 Cal.3d 564, 573-572, fn. 6.)

As a general rule, courts have recognized that a person or entity—whether it be a bank or a merchant—engaged in a financial transaction with a person has a duty (1) not to ignore "red flags" or "suspicious" "circumstances" that may indicate that a third party *involved in that transaction*[3] is being defrauded, and, in that instance, (2) not to proceed with the transaction without first doing some investigation to dispel those suspicions. (*Sun 'n Sand*, *supra*, 21 Cal.3d at pp. 693, 695; *Burns*, *supra*, 173 Cal.App.4th at p. 489; *Joffe v. United California Bank* (1983) 141 Cal.App.3d 541, 556 (*Joffe*); *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192, 1195, 1198 (*Karen Kane*); *Software Design*, *supra*, 49 Cal.App.4th at pp. 480-481, 483; *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 545.)

Courts have sorted the circumstances that constitute red flags from those that do not. Red flags include: (1) when a bank's

---

[3] In the absence of "'extraordinary and specific facts,'" banks and merchants generally do not owe complete strangers to a transaction any duty to investigate the suspicious activities of the bank's or merchant's customers. (*Gil v. Bank of America, N.A.* (2006) 138 Cal.App.4th 1371, 1381; *Software Design & Application, Ltd. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 479 (*Software Design*); *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1148-1151.) Courts are more reluctant to recognize duties in this context because such duties run the risk of "'violat[ing]'" the bank's or merchant's "'customers' right to privacy'" and of "'forc[ing] [the bank or merchant] to act as the guarantor of'" their customers' transactions. (*Casey*, at p. 1149.)

11

customer tries to have the proceeds of the third party's check that was made out to someone else placed in the customer's own personal account (*Sun 'n Sand, supra*, 21 Cal.3d at pp. 693-695; *E. F. Hutton & Co. v. City National Bank* (1983) 149 Cal.App.3d 60, 68 (*E. F. Hutton*); *Sehremelis v. Farmers & Merchants Bank* (1992) 6 Cal.App.4th 767, 772-776 (*Sehremelis*)); or (2) when a bank's customer tries to have the proceeds of the third party's check that was made out to an escrow account placed in the customer's own personal account in contravention of the escrow notation on the face of the check (*Joffe, supra*, 141 Cal.App.3d at pp. 547-548, 556). Red flags do *not* include: (1) when a check-cashing business's customer presents a check endorsed by hand (rather than with a stamp) (*Karen Kane, supra*, 67 Cal.App.4th at p. 1198-1199); (2) when a check-cashing business's customer seeks to cash a business-to-business check (*id.* at pp. 1198, 1202-1203); (3) when a brokerage firm's customer has frequent transactions involving large sums of money (*Software Design, supra*, 49 Cal.App.4th at p. 483); or (4) when a bank's customer opens up an account in a name other than her own (*Rodriguez v. Bank of the West* (2008) 162 Cal.App.4th 454, 466 (*Rodriguez*)).

Because Kader presented two checks payable to The Auto Gallery and bearing Gillam's valid signature on behalf of DeskSite, this case presents the question: Is it a red flag when a merchant receives payment for merchandise through a check from a person or entity other than its customer, such that the merchant owes the drawer of the check some duty to investigate whether the check is somehow fraudulent and whether the

12

check's maker wants the merchant to follow special instructions regarding the sale of the merchandise?[4]

We conclude that the answer to this question is "no," and do so for two reasons.

First, the policy considerations set forth in *Biakanja* and *Rowland* counsel against the recognition of such a duty.

Foreseeability is the "chief" determinant of duty because three of the considerations enumerated in *Biakanja* and *Rowland* address it—namely, the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, and the closeness of the connection between the defendant's conduct and the injury suffered by the plaintiff. (*Vasilenko v. Grace Family Church* (Nov. 13, 2017, S235412) __ Cal.5th __ [2017 Cal. Lexis 8738, at p. *9].) However, where, as here, a merchant is presented with a check that is made out to the merchant, is validly endorsed, and on its face contains no restrictions or special instructions, the merchant has no reason to foresee—from the fact, by itself, that the check is drawn on the account of someone other than the merchant's customer—that the check is not valid, that the check is subject to restrictions or instructions, or that the customer will not convey or otherwise adhere to any restrictions or instructions he has agreed to with the check's maker. (Accord, *Burns*, *supra*, 173 Cal.App.4th at p. 489

---

[4] DeskSite also points to the deposition testimony of some employees of The Auto Gallery, who noted that Kader "portrayed himself as a big shot" and a "pretentious" "wannabe," but DeskSite does not contend that these views of Kader's penchant for self-promotion are red flags that he was deceitful, particularly in light of Kader's presentation of a bona fide check from DeskSite to The Auto Gallery with a memo line bearing Kader's initials.

13

[merchant has no reason for foresee injury to third party because merchant had no reason to foresee that the third party's bank would not detect the fact that a check was unauthorized].)

The remaining factors also counsel against recognizing any duty. In evaluating "'the extent to which the transaction [is] intended to affect the plaintiff,'" we must ascertain the "'primary purpose'" of the transaction and ask whether the plaintiff's interest is central or "'collateral'" to that purpose. (*Summit Financial, supra,* 27 Cal.4th at p. 715; *Biakanja, supra,* 49 Cal.2d at p. 650 [looking to the "'end and aim'" of the transaction].) Here, the primary purpose of a merchant's sale of merchandise to its customer is (obviously) to sell merchandise; verifying that checks made out to the merchant that on their face appear valid are, in fact, valid and free of any special conditions would seem to be collateral to that primary purpose. No "moral blame" attaches to the merchant's conduct because the merchant is simply accepting a check validly made payable to it. (*Burns, supra,* 173 Cal.App.4th at p. 490 [noting that "the person deserving of moral blame" is the dishonest customer, "not" the merchant].) And the "policy of preventing future harm" strongly counsels against imposing this duty to investigate upon merchants because the burdens it would impose far outweigh any benefits. Requiring an investigation whenever a check not in the customer's name is presented means that merchants "would have to stop [their] business every time [they] received such a check in order to make an *independent* inquiry of the" check's maker. (*Burns,* at pp. 489-490.) This would "substantially impede[]" "the flow of commerce." (*Karen Kane, supra,* 67 Cal.App.4th at p. 1199.) Burdening the merchant with investigating whether a valid check from someone other than the customer has strings

14

attached and with thereafter enforcing those strings—rather than having the check's maker make those strings known and enforce those strings itself—also places the burden on the wrong party. "It is that person who has the most control and the most to win or lose . . . with whom the investigative tasks should rest." (*Software Design*, *supra*, 49 Cal.App.4th at p. 483; *Karen Kane*, at p. 1199.)

Second, *Burns* has already held, in a similar but slightly different context, that "the fact that an account payment came from a third party is not enough to put [a merchant] on notice of a potential fraud." (*Burns*, *supra*, 173 Cal.App.4th at pp. 486, 488.) There, the plaintiff's secretary paid off her Neiman Marcus credit card debt using checks she forged from plaintiff's bank account. (*Id*. at pp. 483-486) Plaintiff sued Neiman Marcus for negligence on the ground that its customer's use of checks not in her name to pay her credit card bills was a red flag that triggered a duty to investigate. After evaluating the policy considerations set forth in *Rowland*, *Burns* refused to recognize and impose such a duty upon a retail merchant. (*Id*. at pp. 487-492.) *Burns's* logic applies with equal force here, such that a *merchant's* customer's use of a third party check, by itself, also triggers no duty to investigate.

DeskSite raises four sets of arguments in response.

First, it urges a different weighing of the pertinent policy considerations. More specifically, DeskSite argues that we may not consider its own negligence in failing to monitor Kader's use of its money because doing so would run afoul of the rule that a party's contributory negligence is no longer a bar to tort relief in California. (E.g., *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 779.) However, courts that are balancing the

15

policy considerations set forth in *Biakanja* and *Rowland* are not considering a plaintiff's negligence for the purpose of imposing a bar to relief against the plaintiff in that specific case. Instead, they are considering the plaintiff's negligence as a proxy for whether the class of people in the plaintiff's position are better poised to avoid the complained-of injury than the class of people in the defendant's position. This is valid part of assessing "the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) Indeed, the statute governing the scope of duties of care specifically provides that no duty of care will lie where the putative plaintiff "has, willfully or by want of ordinary care, brought the injury upon himself or herself." (Civ. Code, § 1714, subd. (a).)

DeskSite next argues that the burden can be lessened if the duty to investigate is limited to merchants who receive third party checks that are used to pay for a substantial portion of bigger ticket items. However, this argument poses more questions than it answers: What is a bigger ticket item? What is a substantial portion of the item's price? More to the point, this narrowing at most reduces the universe of merchants or transactions so burdened, but in no way alters our analysis of the other *Biakanja* and *Rowland* factors as to that smaller universe, all of which counsel against recognizing a duty.

DeskSite further asserts that merchants can buy general purpose insurance to cover any liability they might incur if they do not investigate or, even if they investigate, if they do not successfully ferret out restrictions or special instructions accompanying third party checks. This assertion speaks only to

16

the potential availability of insurance, but not to its "cost" or "prevalence." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) It does not alter our analysis.

Second, DeskSite contends that *Sun 'n Sand*, *supra*, 21 Cal.3d 671 and its progeny (namely, *Joffe*, *supra*, 141 Cal.App.3d 541, *E. F. Hutton*, *supra*, 149 Cal.App.3d 60, and *Sehremelis*, *supra*, 6 Cal.App.4th 767) dictate a result in its favor. They do not. As explained above, the transactions in those cases involved a bank customer's attempt to deposit the proceeds from a check made out to someone else into the customer's personal account or an attempt to deposit into the customer's own account the proceeds from a check with an escrow account restriction on its face. (*Sun 'n Sand*, at pp. 693-695; *Joffe*, at pp. 547-548, 556; *E. F. Hutton*, at p. 68; *Sehremelis*, at pp. 772-776.) These are circumstances far more suspicious, and far less common, than the simple use of third party's check to buy merchandise. Indeed, *Sun 'n Sand* itself acknowledged that the duty it was recognizing was "narrowly circumscribed." (*Sun 'n Sand*, at p. 695.) We are loathe to ignore our Supreme Court's own advice. DeskSite acknowledges that the decision in *Burns*, *supra*, 173 Cal.App.4th 479 refutes the logic of its position, but declares that *Burns* was wrongly decided. For the reasons set forth above, we disagree.

Third, DeskSite urges that the trial court erred in refusing to consider the testimony of its expert witness that merchants like The Auto Gallery have "a duty to" "investigat[e] and conduct[] appropriate due diligence" whenever "one party is paying and another party is receiving title" to merchandise. We need not consider whether DeskSite, by challenging the trial court's refusal to consider this testimony for the first time in its reply brief, waived the issue on appeal (*Raceway Ford Cases*

17

(2016) 2 Cal.5th 161, 178) because it is well settled that "expert testimony is incompetent on the . . . question whether [a legal] duty [of care] exists because this is a question of law for the court alone" to decide (*Carleton v. Tortosa* (1993) 14 Cal.App.4th 745, 755; *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 864-865).

Lastly, DeskSite posits that money laundering is a "known concern" within the automobile industry, especially with high-end exotic cars. Even if we accept this to be true, the use of a third party's check to pay for a car by itself is still not a red flag of money laundering, particularly where, as here, the check contains a memo line with the customer's initials on it. Further, courts have refused to fashion new duties to deal with similar endemic problems such as identity theft and have justified that refusal with reasoning that is equally applicable here: "Given the scope of the problem and the consequences to the community of imposing a noncontractual duty with resulting liability for breach, a decision to shift the burden of loss from the actual victim to a third party duped by the thief is one to be made, if at all, by the Legislature, not the judiciary." (*Rodriguez, supra*, 162 Cal.App.4th at p. 466.)

In sum, we independently conclude that The Auto Gallery owed DeskSite no duty of care and, in the absence of such a duty and any evidence indicating The Auto Gallery's actual knowledge of the oral agreement between DeskSite and Kader regarding who should hold title to the car, the trial court properly granted summary adjudication to The Auto Gallery on all of DeskSite's claims against it.

## II.     Rulings on Motions in Limine

As a general rule, "a thief cannot pass title to stolen property." (*People v. Hernandez* (2009) 172 Cal.App.4th 715, 722; *Suburban Motors, Inc. v. State Farm Mut. Auto. Ins. Co.* (1990) 218 Cal.App.3d 1354, 1361; *Kelley Kar Co. v. Maryland Casualty Co.* (1956) 142 Cal.App.2d 263, 264; *Schumann-Heink & Co. v. United States Nat'l Bank* (1930) 108 Cal.App. 223, 230.)  More to the point, such "a thief cannot convey valid title to an innocent purchaser of stolen property." (*Naftzger v. American Numismatic Society* (1996) 42 Cal.App.4th 421, 432-433.)  Given this precedent, a central question to be resolved by the jury during the trial on DeskSite's claim for declaratory relief against the remaining defendants regarding the title of the Lamborghini was whether Kader was a thief:  If he was, DeskSite would be entitled to title to the car; if he was not, then the remaining defendants would prevail if they could establish that they were bona fide purchasers for value.  (See *Melendrez v. D & I Investment, Inc.* (2005) 127 Cal.App.4th 1238, 1251 [defining "bona fide purchaser for value"].)

Prior to the declaratory relief trial, the trial court excluded evidence regarding whether The Auto Gallery was negligent in failing to investigate whether the DeskSite checks Kader presented to buy the car came with any restrictions or special conditions.  DeskSite challenges that ruling on appeal.  We review a trial court's evidentiary rulings for an abuse of discretion.  (*People v. Clark* (2016) 63 Cal.4th 522, 597.)

The court did not abuse its discretion in excluding evidence of The Auto Gallery's negligence.  That is because whether Kader was a thief turned on (1) the nature of the agreement between Kader and DeskSite, and (2) whether Kader violated that

19

agreement. What The Auto Gallery suspected or should have suspected regarding that agreement and Kader's violation of it sheds no light on the agreement itself or Kader's compliance with it. As a result, the evidence was irrelevant and properly excluded. (Evid. Code, § 210.)

DeskSite raises three objections on appeal. First, it notes that the trial court found this evidence to be relevant and excluded the evidence because The Auto Gallery was no longer in the case and "is not here to defend [itself]." However, our task is to review the trial court's ruling, not its reasoning. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.) Its ruling is sound. Second, DeskSite asserts that the trial court effectively and impermissibly granted a nonsuit for the remaining defendants when it excluded this evidence. To be sure, a court may not grant a motion in limine on the ground that a plaintiff cannot prove its case (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 123-124) or use such motions to weigh evidence rather than adjudicate admissibility (*R & B Auto Center, Inc. v. Farmers Group, Inc.* (2006) 140 Cal.App.4th 327, 332-333). But the court here committed neither of these sins. Lastly, DeskSite notes that embezzlement is a form of theft (Pen. Code, § 490a; *People v. Gonzales* (2017) 2 Cal.5th 858, 869 [so noting]), and urges that it does not matter whether Kader committed theft or embezzlement. We need not address this issue because whether Kader committed theft or embezzlement still turns on his agreement with DeskSite, not on what The Auto Gallery knew or should have known about that agreement.

20

## III. Refusal to Award Punitive Damages in Default Judgment Against Kader

When a defendant in a civil case does not answer or otherwise respond to a complaint with a procedurally appropriate filing, the defendant is in default. (Code Civ. Proc., §§ 580, subd. (a) & 585.) Where the relief sought by the plaintiff turns on "the exercise of judgment to ascertain (such as emotional distress damages, pain and suffering, or punitive damages)," the trial court—rather than the clerk—must be the one to enter the default judgment. (*Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 287; Code Civ. Proc., § 585, subd. (b).) In such instances, "the plaintiff must affirmatively establish [its] entitlement to the specific judgment requested" by making a "prima facie case" for the relief sought. (*Kim*, at p. 287; *Johnson v. Stanhiser* (1999) 72 Cal.App.4th 357, 361-362; Code Civ. Proc., § 585, subds. (b) & (d).) The court may only award relief "as appears by the evidence to be just" (Code Civ. Proc., § 585, subd. (b)), and the defaulting defendant's absence imposes upon the court a "duty . . . to act as gatekeeper, ensuring that only the appropriate claims get through" (*Heidary v. Yadollahi* (2002) 99 Cal.App.4th 857, 868; *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1179).

In evaluating whether to award punitive damages, a court must consider "(1) the reprehensibility of the defendant's conduct; (2) the actual harm suffered; and (3) the wealth of the defendant." (*Zaxis Wireless Communications, Inc. v. Motor Sound Corp.* (2001) 89 Cal.App.4th 577, 581-582, citing *Neal v. Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 928.) Because the purpose of punitive damages is "to punish wrongdoing," "the key question

21

before [a] reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.'" (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 (*Adams*), quoting *Neal*, at p. 928.) Evidence of a defendant's wealth or financial condition is essential in evaluating whether a punitive damages award is excessive; "[w]ithout such evidence," the reviewing court cannot do its job. (*Adams*, at pp. 111-112.) The plaintiff seeking punitive damages bears the burden of presenting evidence of the defendant's financial condition. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 546.)

There is no one measure of a defendant's financial condition. The key is "the defendant's ability to pay" the punitive damages award. (*Adams*, *supra*, 54 Cal.3d at p. 112.) A defendant's net worth is the most common measure of that ability, but it is not "the *only* permissible measurement." (*Cummings Medical Corp. v. Occupational Medical Corp.* (1992) 10 Cal.App.4th 1291, 1299.) A defendant's earnings are generally insufficient by themselves because they do not take into consideration debts and liabilities. (*Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1064-1065.) The courts are split on whether the profits wrongfully gained by the defendant are a sufficient measure. (*Robert L. Cloud & Associates, Inc. v. Mikesell* (1999) 69 Cal.App.4th 1141, 1152 [noting split].)

DeskSite challenges the trial court's finding that DeskSite failed to introduce sufficient evidence of Kader's financial condition. We review the damages awarded (or not awarded) in default prove-up proceedings to see whether they are "so disproportionate to the evidence as to suggest that the [judgment] was the result of passion, prejudice, or corruption" or "so out of proportion to the evidence that it shocks the conscience." (*Uva*

22

*v. Evans* (1978) 83 Cal.App.3d 356, 363-364.) "Damages for which there is no substantial evidence, a fortiori, satisfy this standard." (*Ostling v. Loring* (1994) 27 Cal.App.4th 1731, 1746.)

The trial court's refusal to award punitive damages was supported by substantial evidence because DeskSite presented no evidence of Kader's financial condition. DeskSite offered no evidence of Kader's net worth or even any assets that he owned, as DeskSite frankly admitted. Instead, DeskSite offered its expert's opinion that his inability to find any assets was proof that Kader was hiding his assets. Like the trial court, we reject as speculative an expert's opinion that the lack of evidence of a fact is itself evidence of that fact. (E.g., *People v. Brooks* (2017) 3 Cal.5th 1, 120 ["'speculation is not substantial evidence'"].)

DeskSite raises two further arguments. First, it asserts a court may ignore the absence of any evidence of Kader's financial condition in light of his "failure to obey a court order to produce his financial records." (*Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 610.) However, this is not a case where Kader willfully ignored a court order to produce his records; this is a case where Kader defaulted. We decline to hold that there is no cap to punitive damages in default cases. Second, DeskSite contends that it is seeking a modest punitive damages award that equals the amount of compensatory damages. The modesty of the award does not compensate for the absence of any evidence to support it.

**DISPOSITION**

The judgment is affirmed.  The Auto Gallery, Signature, Premier, and Jenkins are entitled to their costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION.**


_____, J.
HOFFSTADT

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.*
GOODMAN

---

*     Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.