Filed 5/8/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KURTZ-AHLERS, LLC,<br><br>    Plaintiff and Appellant,<br><br>       v.<br><br>BANK OF AMERICA, N.A.,<br><br>    Defendant and Respondent. | G057486<br><br>(Super. Ct. No. 30-2016-00856392)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Walter P. Schwarm, Judge. Affirmed.

Epport, Richman & Robbins, Steven N. Richman and Christopher R. Nelson for Plaintiff and Appellant.

Severson & Werson, and Jan T. Chilton for Defendant and Respondent.

\*       \*       \*

Plaintiff company sued its bank for failing to discover the fraudulent banking activities of a fellow account holder who scammed over $700,000 from plaintiff.

Plaintiff contended the bank negligently failed to discover and warn of the scam, given both swindler and victim held bank accounts at the same institution. The trial court granted nonsuit for the bank, ruling the bank had no duty to monitor customer accounts for fraud. We affirm.

I

BACKGROUND

Freelance bookkeeper Elizabeth Mulder perpetrated a nearly five-year fraud against her client, plaintiff Kurtz-Ahlers. Both Kurtz-Ahlers and Mulder coincidentally had their checking accounts at defendant Bank of America (the Bank). Mulder ran her scam through her account at the Bank.

Mulder's scam consisted of the following acts: First, she added the fictitious business name (or "dba") "Income Tax Payments" to her existing checking account at the Bank. Then Mulder instructed Kurtz-Ahlers to write its checks for quarterly state and federal income tax payments to "Income Tax Payments" rather than to the Internal Revenue Service or Franchise Tax Board, and to give the checks to Mulder for mailing. After laying that groundwork, Mulder began depositing Kurtz-Ahlers's tax payment checks drawn from the Bank directly into her personal account at the Bank. Over a period of nearly five years, Mulder swindled Kurtz-Ahlers out of more than $700,000. Eventually, Mulder pleaded guilty to several federal crimes and is currently in federal prison.

After discovering the fraud, Kurtz-Ahlers notified the Bank and made a claim for its losses. The Bank denied the claim and Kurtz-Ahlers sued the Bank for negligence.[1] The complaint alleged the Bank acted negligently in failing to monitor Mulder's account for fraudulent activity after permitting her to add the "inherently suspicious" name "Income Tax Payments" to the account.

---

[1]     Kurtz-Ahlers also sued the Bank for conversion, but the Bank successfully moved for summary adjudication of the conversion cause of action.

2

After a two-week jury trial, the trial court granted the Bank's motion for nonsuit (Code Civ. Proc., § 581c), essentially holding the Bank owed Kurtz-Ahlers no duty to investigate or monitor Mulder's account.

## II

### DISCUSSION

A. *Standard of Review*

"Recovery in a negligence action depends as a threshold matter on whether the defendant had '"a duty to use due care toward an interest of [the plaintiff's] that enjoys legal protection against unintentional invasion."'" (*Centinela* [*Freeman Emergency Medical Associates v. Health Net of California, Inc.* (2016)] 1 Cal.5th [994,] 1012 [(*Centinela*)], quoting *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397.) We review de novo whether this '"essential prerequisite"' to recovery is satisfied. [Citation]." (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 397-398, fn. omitted (*Gas Leak Cases*); see also *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57 [whether duty of care exists is question of law subject to independent review] (*Quelimane*).)

We also independently review a trial court's grant of nonsuit. (*Legendary Investors Group No. 1, LLC v. Niemann* (2014) 224 Cal.App.4th 1407, 1412.)

B. *The Trial Court Properly Granted Nonsuit for the Bank*

Kurtz-Ahlers argues two grounds for finding the trial court erred in granting the Bank's motion for nonsuit. First, Kurtz-Ahlers argues the court erred in taking from the jury the disputed issue of whether the dba "Income Tax Payments" was so suspicious it triggered a duty on the part of the Bank to investigate possible fraudulent activity in Mulder's account. Second, Kurtz-Ahlers contends the court wrongly concluded as a matter of law banks owe no duty to depositors to monitor other depositors' accounts for fraud. In regard to the latter contention, Kurtz-Ahlers argues

3

existing case law supports finding the Bank had a duty of inquiry. Alternatively, Kurtz-Ahlers argues we should recognize a new duty of inquiry owed by banks to depositors.

For the reasons set forth below, the trial court correctly ruled as a matter of law the Bank had no duty to monitor Mulder's account. That conclusion renders moot the dispute over whether Mulder's dba "Income Tax Payments" was a highly suspicious "red flag" triggering an inquiry into possible fraud. Consequently, we conclude the court properly granted nonsuit for the Bank.

1. *Banks Have No Common Law Duty to Monitor Deposit Accounts*

There is a wealth of case law defining the duties a bank owes to account holders. Those duties do not include "policing" other depositors' accounts for fraud.

The relationship between a bank and its depositor is not fiduciary in character but, rather, "'founded on contract,' [citation] which is ordinarily memorialized by a signature card that the depositor signs upon opening the account. [Citation.]" (*Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 537 (*Chazen*) ["banks 'are not fiduciaries for their depositors'"].) "This contractual relationship does not involve any implied duty 'to supervise account activity' [Citation] or 'to inquire into the purpose for which the funds are being used' [Citation] . . . ." (*Ibid.*) Nevertheless, "[i]t is well established that a bank has 'a duty to act with reasonable care in its transactions with its depositors . . . .' (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 808 [(*Bullis*)].) The duty is an implied term in the contract between the bank and its depositor. (See *Barclay Kitchen, Inc. v. California Bank* [(1962)] 208 Cal.App.2d [347,] 353 [(*Barclay Kitchen*)].)" (*Chazen*, *supra*, 61 Cal.App.4th at p. 543.)

Case law reflects the narrow scope of a bank's duties under the deposit agreement. Such duties include the duty to *honor* checks properly payable from the depositor's account (*Chazen*, *supra*, 61 Cal.App.4th at p. 539 ["Banks are strictly liable for the wrongful dishonor of checks"]; *Joffe v. United California Bank* (1983) 141 Cal.App.3d 541, 554 (*Joffe*)); the duty to *dishonor* checks lacking required signatures

4

(*Bullis*, *supra*, 21 Cal.3d at p. 811 [bank liable for failing to require signatures of both co-executors for withdrawal from trust estate]); and the duty "to render faithful and accurate accounts under the contract of deposit" (*Barclay Kitchen*, *supra*, 208 Cal.App.2d at p. 354).

The parties have not cited, and we have not found, any published case involving the issue of whether a bank owes a depositor a duty to investigate and disclose possible fraudulent activity in another depositor's account. A legion of cases, however, rejects the notion banks owe such a duty to *nondepositors*. In *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138 (*Casey*), another panel of this court presented a "primer on California banking law" and pronounced the following blanket rule: "[U]nder California law, a bank owes no duty to nondepositors to investigate or disclose suspicious activities on the part of an account holder." (*Id.* at p. 1149.)

*Casey* cited numerous cases which refused to recognize a bank's duty to third parties to "police" a depositor's account. "[I]in *Chicago Title Ins. Co. v. Superior Court* (1985) 174 Cal.App.3d 1142, the court rejected a nondepositor's claim a bank had a duty to inform the nondepositor of the bank's suspicions a bank customer was involved in a check-kiting scheme: 'If . . . banks had a duty to reveal suspicions about their customers, they would violate their customers' right to privacy, not to mention be forced to act as the guarantor of checks written by the depositors. We refuse to recognize such a duty by banks to inform on suspicious customers, and we thereby avoid the loss of privacy, expense and commercial havoc that would result from such a holding.' (*Id.* at p. 1159; accord, *Software Design & Application LTD. v. Hoefer & Arnett, Inc.* (1996) 49 Cal.App.4th 472, 483 [(*Software Design*)] [financial consultant deposited client's funds in bank account and embezzled the funds; client sued bank for failing to investigate and monitor the account; court held bank owed no duty to investor—a nondepositor: 'Scrutiny into the financial and business affairs of prospective customers for the express purpose of ferreting out the faithless fiduciary and divining illegal conduits for embezzled

funds would be intrusive for the citizenry and add to the cost of financial transactions, both in terms of time and money']; *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192, 1199 [(*Karen Kane*)] [bank had no duty to inform nondepositor maker of checks of bank's suspicions payee was defrauding maker].)" (*Casey, supra*, 127 Cal.App.4th at pp. 1149-1150.)

In a *Casey* footnote, we noted a single, narrow exception to the otherwise sweeping rule a bank owes no duty to nondepositors to investigate or disclose a depositor's suspicious activities. "California courts have recognized one situation in which a bank has a duty to nondepositors to investigate a suspicious banking transaction. In *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671 [(*Sun 'n Sand*)], the California Supreme Court held a bank has a 'minimal' and 'narrowly circumscribed' duty of inquiry 'when checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit.' (*Id*. at p. 695.)" (*Casey*, *supra*, 127 Cal.App.4th at p. 1151, fn. 3.) Kurtz-Ahlers cites the *Sun 'n Sand* exception as the basis for its argument current law imposed a duty of inquiry on the Bank.

In *Sun 'n Sand*, the plaintiff, convinced by a dishonest employee that it owed minor sums of money to a bank, made several checks payable to that bank. The employee altered the checks to increase the sums and deposited them in her personal account with the same bank. The bank permitted this negotiation without any inquiry, despite the fact the checks were not payable to the employee. Upon discovering the employee's fraud, the plaintiff sued the bank for negligence, among other claims. The trial court sustained the bank's demurrer to all the claims and dismissed the action.

The Supreme Court reversed the trial court's ruling on the negligence claim, concluding "Sun 'n Sand's allegations define circumstances sufficiently suspicious that [the bank] should have been alerted to the risk that Sun 'n Sand's employee was perpetrating a fraud. By making reasonable inquiries, [the bank] could have discovered

6

the fraudulent scheme and prevented its success." (*Sun 'n Sand*, *supra*, 21 Cal.3d at pp. 694-695.)

Significantly, the high court set sharp limits on the reach of this new duty of inquiry: "The duty is narrowly circumscribed: it is activated only when checks, not insignificant in amount, are *drawn payable to the order of a bank* and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit. Moreover, the bank's obligation is minimal. We hold simply that the bank may not ignore the danger signals inherent in such an attempted negotiation. There must be some objective indicia from which the bank could reasonably conclude that the party presenting the check is authorized to transact in the manner proposed." (*Sun 'n Sand*, *supra*, at pp. 695-696, italics added.)

Kurtz-Ahlers argues the facts of this case come within *Sun 'n Sand's* narrow "duty of inquiry" exception because Mulder's addition of the name "Income Tax Payments" to her account was a circumstance "sufficiently suspicious" to trigger that duty. The argument fails because the factual circumstances of this case, no matter how "suspicious," do not match the very particular factual scenario the Supreme Court addressed in *Sun 'n Sand*. As *Chazen*, *supra*, 61 Cal.App.4th 532, explained: "*Sun 'n Sand* and its progeny have held banks to be subject to a duty of care toward nondepositors only in narrow factual circumstances: Each case involved the bank's liability for allowing a person to deposit a check, *payable to someone else*, into a personal account[.]" (*Chazen*, *supra*, 61 Cal.App.4th at p. 545; accord, *Software Design*, *supra*, 49 Cal.App.4th at pp. 480-481 ["The danger signals triggered in these cases all stemmed from the particular circumstances of the checks, endorsements or depositors, where the person attempting to negotiate the check is not the payee"].) By comparison, in the present case Mulder deposited checks *payable to her*.

In other words, unlike in *Sun 'n Sand*, the checks Mulder submitted for deposit had "objective indicia from which the bank could reasonably conclude that the

party presenting the check is authorized to transact in the manner proposed." (*Surf 'n Sand*, *supra*, 21 Cal.3d at pp. 695-696.)  Here, the "objective indicia" test was met because the checks were made payable to the very account in which they were deposited, "Income Tax Payments," and an authorized signatory endorsed each check. Consequently, the "narrowly circumscribed" duty to inquire recognized in *Surf 'n Sand* does not apply here.  (*Ibid.*; see also *QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 994 (QDOS) [seller had no duty of inquiry under *Sun 'n Sand* where customer paid seller with two checks made payable to *seller* but drawn on a third party's account]; *Karen Kane*, *supra*, 67 Cal.App.4th at pp. 1198-1199 [bank had no duty of inquiry as to "business-to-business checks . . . regular on their face" and endorsed by authorized signatories].)

Because the facts of this case do not fit within the narrow *Sun 'n Sand* exception, Kurtz-Ahlers failed to demonstrate the Bank had a duty under existing law to inquire into Mulder's account activities.

### 2.  *There is No Basis for Creating a New Duty of Inquiry*

Kurtz-Ahlers alternatively argues we should recognize a new duty on banks, owed only to depositors, to monitor any account with a fictitious business name so "odd," "generic," or otherwise "suspicious" that it gives a bank reason to suspect the account holder of fraudulent activity.[2]  Kurtz-Ahlers characterizes the existence of this new monitoring duty as an important question of first impression.  We are unpersuaded.

As we explain below, we see no basis to broaden a bank's duty of inquiry beyond the "narrowly circumscribed" duty the Supreme Court articulated in *Sun 'n Sand*: to make "reasonable inquiries" when "checks, not insignificant in amount, are drawn

_____

[2]     The argument is premised, in part, on the contention agency law imputes a bank's "constructive knowledge" of one depositor's fraudulent activities to the bank in its dealings with *all* depositors.  Kurtz-Ahlers cites no authority for applying these agency principles in the bank-depositor context.

payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit." (*Sun 'n Sand*, *supra*, 21 Cal.3d at p. 695.)

We begin our duty analysis by acknowledging a fundamental rule in tort law: "[L]iability in negligence for purely economic losses . . . is 'the exception, not the rule[.]'" (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 400, quoting *Quelimane*, *supra*, 19 Cal.4th at p. 58.)[3] "Whether a court will nevertheless recognize such a duty does not turn on privity of contract. (*Centinela*[*, supra,*] 1 Cal.5th at p. 1013; *Quelimane*, at p. 58.) Instead, it turns on whether '"public policy . . . dictate[s] the existence of a duty to third parties."' (*Centinela* [], at p. 1013; *Cabral* [*v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764,] 771 ['courts should create [a duty] only where "clearly supported by public policy"'].)" (*QDOS, supra*, 17 Cal.App.5th at p. 998.) It is on policy grounds where Kurtz-Ahlers's "new duty" argument founders.

Case law has long recognized the significant public policies underlying the rule "a bank owes no duty to nondepositors to investigate or disclose suspicious activities on the part of an account holder." (*Casey*, *supra*, 127 Cal.App.4th at p. 1149.) In *Casey*, *supra*, 127 Cal.App.4th 1138, we referenced *Chazen*, *supra*, 61 Cal.App.4th 532 to aptly summarize those policies. "The [*Chazen*] court explained the contractual nature of the bank-depositor relationship limits a bank's duties in regards to accounts. The court stated that 'this contractual relationship . . . entails no contractual obligation to persons other than the account holder [citation]. . . .' (Ibid.) [¶] The [*Chazen*] court identified two additional policies underlying the rule a bank has no duty to 'police' account activity. One is the customer's right to privacy. ""A bank customer's reasonable expectation is

---

3    By "purely economic losses," the court meant pecuniary losses unaccompanied by injury to person or property. (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 398.) Kurtz-Ahlers concedes only economic losses are at issue here.

that, absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes[.]"'" (*Id.* at p. 538.)

"The other policy cited by the court was that of facilitating the efficient processing of banking transactions. The court noted the present banking system operates under rules requiring 'banking transactions to be processed quickly and automatically and impos[ing] strict deadlines for the payment or timely dishonor of checks. [Citations.] . . . Under this system . . . a bank cannot be expected to track transactions in fiduciary accounts or to intervene in suspicious activities.' (*Chazen*, *supra*, 61 Cal.App.4th at p. 539.)" (*Casey*, *supra*, 127 Cal.App.4th at pp. 1149-1151.)

Without addressing these important policies militating against requiring banks to "police" deposit accounts, Kurtz-Ahlers urges us to recognize a new bank duty owed *only to depositors* to monitor other depositors' "suspicious activities." The only policy argument Kurtz-Ahlers offers in support of this new "intra-bank" duty is that a bank is uniquely able to detect a depositor's fraudulent activities and protect other depositors from that fraud. Setting aside the practical questions about a bank's ability to perform either task, we reject the argument because imposing this new duty would jeopardize the very policies we identified above.

For example, monitoring individual banking transactions to detect fraudulent activity would imperil both customer privacy and the expedited processing of banking transactions so crucial to a modern economy. (See *Chazen*, *supra*, 61 Cal.App.4th at pp. 537-539.) Additionally, imposing liability for failing to protect a depositor from fraud would place a bank in an untenable position: By investigating and thereby delaying the processing of banking transactions between a suspected fraudster and another depositor, the bank would face liability for violating strict statutory "deadlines for the payment or timely dishonor of checks." (*Chazen*, *supra*, 61 Cal.App.4th at p. 539 ["provisions of the California Uniform Commercial Code and federal regulations governing bank deposits and collections require banking transactions

10

to be processed quickly and automatically and impose strict deadlines for the payment or timely dishonor of checks"].)

For its part, Kurtz-Ahlers asserts an intra-bank duty of inquiry would impose a "minor burden" on banks easily outweighed by the resulting benefit of protecting depositors from misappropriation by fraudsters like Mulder. But the argument overlooks the fact depositors are often, if not always, in a better position than their banks to protect themselves from fraud by simple steps such as using due diligence in hiring bookkeepers and by occasionally checking their financial records. In Kurtz-Ahlers's case it would not have been too difficult to discover *five years'* worth of diverted tax payments, had Kurtz-Ahlers exercised basic prudence. In other words, Kurtz-Ahlers makes no compelling argument why the Bank should have borne the burden of detecting Mulder's fraudulent scheme rather than Kurtz-Ahlers itself.

We decline Kurtz-Ahlers's invitation to engage in a careful weighing of "the *Biakanja/Rowland* factors" — the factors the Supreme Court identified as particularly relevant to determining the existence of a duty in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 (*Biakanja*) and *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 (*Rowland*).[4] In other words, we see no need to engage in a point by point consideration of those factors to arrive at the conclusion public policy does not weigh in favor of recognizing the new bank duty Kurtz-Ahlers urges us to adopt.

The court in *Software Design*, *supra*, 49 Cal.App.4th 472, expressed this conclusion perfectly: "[T]he burden on banks, if we were to recognize a duty of inquiry

---

[4] These factors include '". . . the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.'" (*Sun 'n Sand*, *supra*, 21 Cal.3d at p. 695, quoting *Rowland*, *supra*, 69 Cal.2d at p. 113.)

11

and detection in the circumstances of appellants' complaint, is out of proportion to the potential harm averted by such a result. Scrutiny into the financial and business affairs of prospective customers for the express purpose of ferreting out the faithless fiduciary and divining illegal conduits for embezzled funds would be intrusive for the citizenry and add to the cost of financial transactions, both in terms of time and money. Better that the one contemplating the services of a financial advisor do the background check and then monitor the services rendered. It is that person who has the most control and the most to win or lose, and with whom the investigative tasks should rest." (*Id.* at p. 483.)

In sum, we conclude "'overriding policy considerations'" preclude the existence of an "intra-bank" monitoring duty under general tort principles. (*Dillon v. Legg* (1968) 68 Cal.2d 728, 739.) Consequently, we find the trial court properly granted nonsuit for the Bank.

## III

### DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.


ARONSON, J.

WE CONCUR:


MOORE, ACTING P. J.


THOMPSON, J.

12