Filed 12/27/24  Thompson v. Ogletree, Deakins etc. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LISA THOMPSON,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.,<br><br>    Defendant and Respondent. | B325504<br><br>(Los Angeles County Super. Ct. No. 21STCV15251) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gail Killefer, Judge.  Reversed and remanded.

Law Offices of Sandra C. Muñoz and Sandra C. Muñoz for Plaintiff and Appellant.

Ballard Rosenberg Golper & Savitt, Linda Miller Savitt, John J. Manier, and Olga G. Peña for Defendant and Respondent.

_____

Lisa Thompson (plaintiff) sued her employer Ogletree, Deakins, Nash, Smoak, and Stewart, P.C. (defendant) under the Federal Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) for disability discrimination and related claims. The trial court granted defendant's motion for summary judgment. We conclude that plaintiff raised a triable issue of material fact as to each of her causes of action. Accordingly, we reverse the judgment in defendant's favor and remand for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL BACKGROUND[1]

Defendant is an employment law firm operating 50 offices nationwide, including in Los Angeles and Orange County. Defendant hired plaintiff in 2007 to work in its Los Angeles office, where she worked as a records clerk until defendant terminated her employment in 2020.

### A. *Plaintiff's Employment History*

Plaintiff was hired in October 2007 as a general office clerk, and in November 2008 was reclassified as a records clerk, one of three in the Los Angeles office. That office was the only office with more than one records clerk due to its large volume of cases.

---

[1] We have liberally construed all evidence in support of plaintiff and resolved any doubts in her favor. (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717.)

The duties of a records clerk include, among others, to "maintain[] all files" in the records center; create new records in the records management system, including making and placing labels appropriately; file documents in the client folders; and stay up-to-date on technologies and methodologies for records management operations.

1. Plaintiff's assignment

Throughout her employment, plaintiff was assigned tasks other than record management, such as covering the reception desk while the receptionist was on breaks and setting up conference rooms. As for her records duties, plaintiff was assigned cases for clients with names in the A-G range, with the remaining range divided between the other two records clerks. One clerk position was eliminated at some point, leaving plaintiff and Robyn Steed (Steed) as the two remaining clerks, with Steed in charge of the H-Z range. Throughout her employment, Steed performed all her duties successfully, maintained her records current and filed, and her work area organized. Steed also performed some tasks germane to the records clerk position that plaintiff did not perform, such as working with vendors to deposit or retrieve records, processing client file transfers, and training firm staff on best records management practices. From the outset, plaintiff and Steed did not get along, and plaintiff sought to be moved away from her.

3

2. Plaintiff's personnel file

Plaintiff's supervisor was office administrator Lynnette Harris (Harris) until 2012, when Harris was replaced by Christy Barrett (Barrett).  In January 2008, Harris wrote plaintiff an email directing her to, "Please organize your drawer to reflect the A-Z filing system adopted for use by this office."  In March 2008, Harris wrote to plaintiff, "Please confirm that your . . . filing is caught up to date, i.e.[,] all documents are current within 48-72 hours of receipt."  Plaintiff responded, "D[ue] to the fact that I have a multitasking workload, my filing is slightly behind.  Eight hours of my day, I try to maintain my other responsibilities (relieve reception, clean and set-up conference rooms, help with mail and copy jobs, clean kitchen, load dish washer and clean refrigerator etc.) . . . If you want filing to take a higher priority[,] please let me know."  The record does not include any response by plaintiff's supervisors instructing her to give greater priority to filing or alleviating her of the additional responsibilities she carried.

Plaintiff requested and received medical leave between March 21, 2008, and May 16, 2008.

Harris kept a note dated May 21, 2008, in plaintiff's personnel file documenting her meeting with plaintiff "to go over a stack of pleading and discovery indices [plaintiff prepared] that contained errors," during which Harris "pointed out that most of the mistakes were a lack of attention to detail and that [plaintiff] needed to pay closer attention to the document titles and party information."

Plaintiff received positive ratings across various categories on her performance evaluations, consistently receiving marks

4

that she "meets" or "exceeds" expectations. In her evaluation for April 2016 through March 2017, Barrett described plaintiff as doing "a good job on a very busy desk with volumes of incoming work," and "actively working on reducing the backlog of filing that occasionally occurs." Barrett encouraged plaintiff to "continue to work . . . to keep abreast of procedures and technology" and "to continue exploring options that will improve her workflow." In her evaluation for the period of April 2017 through March 2018, Barrett thanked plaintiff for her good work and described her as a "committed member of the LA Office team [who] works well with other staff members . . . ." Barrett also outlined a performance plan for plaintiff "to better keep up with her workload," "encourag[ing] her to ask for assistance when she gets overwhelmed, so that others can locate [items] without digging through boxes and piles."

3. Plaintiff's move to the 11th floor

In 2015 or 2016, plaintiff moved to a newly built records room on the 11th floor, which was quieter, smaller, and initially lacked adequate shelves for the files plaintiff managed. Steed maintained her portion of the records in the 12th floor records room. Barrett told plaintiff to leave the door to the 11th-floor records room open, but plaintiff usually kept it closed because of noise in the hallway outside. Barrett seldom saw plaintiff after she moved to the 11th floor.

In April 2016, Sharon Key (Key), the national records manager at the time, traveled from South Carolina to observe the records room, and noted plaintiff had "a severe backlog of filing needing to be attended to which was causing a lag in attorney

5

work product because documents were not [in] the files on the shelf. She [kept] loose paperwork in . . . a way [that required her] to touch the same document multiple times before" she filed it. However, as long as plaintiff was in the office, no one complained about missing documents because plaintiff could personally locate them.

Plaintiff requested defendant hire someone to help her with her work on multiple occasions between when she moved to the 11th floor and when she went out on leave in October 2018. Plaintiff asked for help because she fell "behind" after moving to the 11th floor, but Barrett and the firm's managing shareholder at the time, David Raizman (Raizman), told her to do what she could.

In July 2018, Edward Fisher replaced Key as the senior records manager, overseeing records management staff across all defendant's offices nationwide.

4. Plaintiff's October 2018 medical leave and Fisher's visit to records room

Plaintiff requested and was granted a leave from October 8, 2018, through December 27, 2018, to have surgery on her knee. On October 25, 2018, Fisher visited the Los Angeles office to evaluate its recordkeeping. He found Steed's 12th floor records to be "neat, clean, and well-organized." However, he found plaintiff's 11th-floor records room "cluttered and disorganized, making it very difficult to find documents." He observed what he estimated to be 90 boxes of loose documents, some of which he photographed. Fisher also obtained a report of the entries made into the records management system, which showed that between

6

October 2017 and October 2018, Steed had completed 31,842 tasks and plaintiff 7,236. Fisher shared his findings from his visit with the director of risk management Paul Singleton, who called the backlog "jaw-dropping," and made addressing it a priority. Fisher assigned Marc Fregoso (Fregoso), a records clerk from the Orange County office, to the 11th-floor records room "a few times a week" on a temporary basis so that he and Steed could clear the backlog in plaintiff's records room. Fregoso and Steed eventually cleared the backlog while keeping current with their own work.

### 5. Plaintiff's return to work in January 2019

Plaintiff returned to work in January 2019 with certain doctor-recommended restrictions, including working part time for two weeks, not lifting more than 20 pounds, and not sitting for extended periods of more than an hour. Plaintiff related these recommendations to defendant, and she was permitted to work consistent with these restrictions. Fregoso continued to work on the 11th-floor records room for some time after plaintiff's return. Fregoso did not discuss with plaintiff what he had done or how he had done it while she was out on leave.

Fisher emailed plaintiff to ask how she was doing in January 2019, and plaintiff responded that she was stressed out trying to keep up with work because she had therapy three times a week and had also recently been assigned 200 new cases. She also requested from Fisher additional training on defendant's new software program. He responded, wishing her "a continued positive recovery," and stated that he "will ask [someone] to get back [to plaintiff] concerning additional . . . training" for the new

7

software program. The record does not indicate that plaintiff received additional training.

Fisher received an audit of the records management system and found that between April 1 and May 23, 2019, Steed had created and modified 1,628 items, and plaintiff 248. Fisher planned another visit to the Los Angeles office to discuss with plaintiff the state of her records room. He emailed plaintiff, Steed, and Fregoso on June 7, 2019, stating his plan to visit the following week. Plaintiff replied, "If it's the Lord[']s will . . . ." Fisher instructed them each to email him a description of what they do at work, to which plaintiff responded that she did not have the time.

6. Plaintiff's leave from June 11, 2019, until March 2020

When Fisher arrived at the Los Angeles office on June 11, 2019, plaintiff had called out sick because, in her own words, she "had fallen into a serious state of depression," and was experiencing what felt like "a nervous breakdown." A doctor placed her on leave until July, which was ultimately extended into March 2020, during which time plaintiff had surgery on her other knee.

Fisher found the 11th-floor records room in a "deteriorated" state and interviewed some select firm personnel about the recordkeeping. One of the individuals interviewed described plaintiff as "[r]ude and unprofessional[, and] seems as though . . . inconvenienc[ed]" when asked for help, described the 11th-floor records room as "cluttered," and reported that "[f]iles are routinely not up to date" and "missing documents," and "[i]ndexing is way behind," such that one "cannot rely on its

8

accuracy." The other interviewee described plaintiff as "[v]ery helpful, professional," but nonetheless described the 11th-floor records room as "full" of "lots of stuff in boxes," and reported having "[v]ery little confidence that files and pleadings indexes [were] up to date," and sometimes finding that no pleading index was created for documents sent to records for indexing. However, at Barrett's suggestion, Fisher did not interview a certain employee because the employee was plaintiff's "very close friend." Fisher created a report of his findings, which included photos showing that the 11th-floor records room had fallen back to the same state of disarray as in October 2018. Boxes of loose documents had not been processed or filed. In contrast, Steed's records room on the 12th floor contained only one half-filled drawer with documents that had not been filed yet. Fisher also ran a report of the records activity between April 8, 2019, and June 10, 2019, finding that Steed had created 813 files, modified 1,236 files, and boxed 585 files, whereas plaintiff had created 408 files, modified 125 files, and boxed zero files.

Fisher included his findings and recommendations in a report, which he forwarded to Robert Roginson, who replaced Raizman as the managing shareholder of the Los Angeles office in July 2019.

While Thompson was still on medical leave, Fregoso was again assigned to the Los Angeles office a few times a week to work on the backlog in the 11th-floor records room. Defendant also hired a temporary employee, Darrell Cowgill (Cowgill), to join Fregoso's effort and assist with other tasks. The backlog was cleared in October 2019, as documented in photographs Fregoso took in October 2019.

7. Plaintiff's immediate termination upon her return from leave

Plaintiff's leave ended in March 2020, and her doctor prescribed restrictions for an initial three-month period not to lift weight greater than ten pounds, and not to sit for more than thirty minutes without standing and stretching. Defendant did not attempt to discuss these restrictions with plaintiff. When plaintiff returned to work on March 10, 2020, she met with Barrett and Roginson to discuss her performance. Roginson did not speak with plaintiff about her performance before the March 2020 meeting. According to him, Roginson had decided that unless plaintiff said something at the meeting that changed his mind, she should be terminated based on her repeatedly falling behind in work, even after others had cleared her backlog while she was on leave. At the March 2020 meeting, plaintiff explained to Barrett and Roginson that she sometimes needed help with her work. After the meeting, plaintiff was sent home, and Barrett sent her an email later that day to inform her she was terminated. Defendant replaced plaintiff with Cowgill.

The ensuing pandemic accelerated defendant's shift to paperless records management, and by July 2020, defendant laid Cowgill off because he was no longer necessary. Since then, Steed alone has successfully managed the records for the Los Angeles office.

## PROCEDURAL BACKGROUND

On April 22, 2021, plaintiff filed a complaint against defendant under FEHA (Gov. Code, § 12900 et seq.) for

(1) disability discrimination, (2) failure to accommodate, (3) failure to engage in the interactive process, (4) retaliation, and (5) failure to prevent discrimination; and under the common law for (6) wrongful termination in violation of public policy.

Defendant moved for summary judgment on the grounds that plaintiff's termination was not based on any actual or perceived disability, plaintiff was unable to perform the essential duties of her job with or without accommodation, no reasonable accommodation existed that would have enabled her to fulfill her essential duties, and defendant had a legitimate non-discriminatory or retaliatory reason for terminating her—that is, her repeated failure to keep up with her work.  Following further briefing and a hearing, the trial court granted defendant's motion for summary judgment.

Plaintiff filed a timely notice of appeal.

## DISCUSSION

Plaintiff argues the trial court erred in concluding that there was no triable issue of material fact as to any of her claims. We agree.

## I.    Standard of Review for Summary Judgment

Summary judgment is appropriate when the moving party shows "[it] is entitled to a judgment as a matter of law" (Code Civ. Proc., § 437c, subd. (c)) because, among other things, the nonmoving party cannot establish "[o]ne or more elements of the[ir] cause of action" (*id.*, subds. (o)(1) & (p)(2)).  (*QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 998.)  In

11

this way, summary judgment serves as " 'a vehicle to weed the judicial system of an unmeritorious case . . . .' " (*Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 299.)  Summary judgment should be denied only if there are "genuine" or "triable" issues of fact to be resolved at trial—that is, "if, the evidence would allow a reasonable trier of fact to find . . . in favor of the party opposing the motion . . . ."  (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860 (*Serri*).)

We review a trial court's summary judgment ruling independently, without regard to its conclusions or reasoning.  (*Minish v. Hanuman Fellowship* (2013) 214 Cal.App.4th 437, 455.)  In so doing, we may not weigh conflicting evidence or assess witnesses' credibility (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 319), and we must resolve any doubts against summary judgment (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 415).

## II.  Disability Discrimination

### A. *Pertinent law*

FEHA prohibits an employer from discriminating against an employee "because of [the employee's] . . . physical disability," or "medical condition," among other things.  (Gov. Code, § 12940, subds. (a).)  An employer, however, is not prohibited from terminating the employment of an employee with a physical disability or medical condition where, as a result of the condition, the employee is unable to perform his or her essential duties even with reasonable accommodations.  (*Id.*, subd. (a)(1), (2).)

12

In evaluating FEHA discrimination claims, California uses a burden-shifting mechanism, known as the *McDonnell Douglas* test. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354–355 (*Guz*); *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792.) At trial, the mechanism requires the plaintiff-employee to first establish a prima facie case of discrimination. (*Guz*, at pp. 354–355; *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) If the plaintiff makes out a prima facie case, then it is rebuttably presumed that the employer engaged in discrimination, and the burden shifts to the employer to set forth a legitimate nondiscriminatory reason for the "adverse employment action" the plaintiff claims was a result of discrimination. (*Guz*, *supra*, at pp. 355–356; *Yanowitz*, *supra*, at p. 1042.) If the employer sets forth such a reason, the burden shifts back to the employee to prove intentional discrimination. (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 965.)

This burden-shifting mechanism works differently in the context of a motion for summary judgment. (*Serri*, *supra*, 226 Cal.App.4th at p. 861.) An employer moving for summary judgment bears the initial burden to disprove an element of the plaintiff's prima facie case or adduce evidence showing a legitimate, nondiscriminatory reason for its adverse employment action. (*Ibid*.) If it does so, then the burden shifts to the employee to produce "substantial responsive evidence" that the employer's stated reasons were untrue or pretextual, or the employer acted with discriminatory animus. (*Serri*, at p. 862.) "It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive." (*Ibid*.)

13

A prima facie showing of disability discrimination under FEHA requires the plaintiff to produce evidence that the plaintiff (1) suffered from a disability, (2) was otherwise qualified to do his or her job, with or without reasonable accommodation, and (3) was subjected to adverse employment action because of her disability.  (*Castro-Ramirez v. Dependable Highway Express, Inc.* (2016) 2 Cal.App.5th 1028, 1037.)  Here, defendant does not dispute that plaintiff had an actual or perceived disability for FEHA purposes, or that it subjected her to an adverse employment action when it terminated her.

B. *Defendant fails to show that plaintiff did not state a prima facie case of discrimination*

Defendant argues that the undisputed evidence presented at summary judgment was sufficient to disprove an essential element of plaintiff's prima facie case:  that she was able to perform the essential functions of her job as a records clerk. Specifically, defendant contends that even before any disability, plaintiff was unable (with or without reasonable accommodation) to create and maintain the files for cases assigned to her in a state where anyone could retrieve necessary documents; defendant describes this as an essential job function.  We disagree.

In the period from January 2008 until plaintiff was placed on medical leave in 2018, defendant rated plaintiff's work as meeting or exceeding expectations in all respects, despite the fact that there were several reports of the records assigned to plaintiff not being up to date.  When plaintiff herself raised with defendant that the additional responsibilities she was being

14

assigned interfered with her ability to perform her work as a records clerk, defendant did nothing to relieve her of the additional work, or even to prioritize the records filing. Plaintiff was also able to locate documents when in the office, hence the lack of complaints about access to them. Moreover, when the issue of backlogs was raised with defendant, her direct supervisor, Barrett, and the managing shareholder, Raizman, told plaintiff to do what she could.[2] Although there were criticisms and recommendations for improvement made in the context of plaintiff's favorable reviews, they fell far short of suggesting that plaintiff was failing to perform an essential job function, or that a failure to do more to keep her record filing current could result in discipline or termination. The consistently favorable reviews, the lack of attention to prioritizing plaintiff's work as a records clerk, the lack of any indication of the seriousness of any perceived failures in her filing responsibilities, and the advice that plaintiff just do what she was able to do defeat defendant's claim that it is an undisputed fact that for years prior to her medical leave plaintiff was failing to perform an essential job function.

Setting aside the period prior to plaintiff's medical leave, defendant points to the review by the new records manager, Fisher, of the 11th-floor records room in October 2018, and his second review in June 2019, to argue that at this later time it became clear plaintiff was not performing her essential duties. But it is undisputed that none of Fisher's findings were ever

---

[2]    The trial court abused its discretion in sustaining defendant's objection to plaintiff's testimony that Raizman and Barrett told plaintiff to do what she could in response to her pleas for help to keep up with her work (objection 20).

15

shared with plaintiff.  Further, while Fisher included extensive analysis comparing plaintiff's productivity to her coworker Steed's productivity, the record does not include any evidence of a particular objective measure of productivity for a records clerk to be meeting expectations.  Neither Fisher nor anyone else ever provided guidelines on, for example, the minimum number of files plaintiff had to create or box per day to be performing her job competently.  Nor do any such metrics exist in the record.  On this record, the issue of what the essential job functions of a records clerk required, and consequently whether plaintiff was meeting those expectations, remains a disputed issue of fact.

C. *Plaintiff raised a triable issue on her disability discrimination claim*

Plaintiff does not dispute that defendant has proffered evidence showing it had a legitimate nondiscriminatory reason for terminating her (i.e., her failure to maintain her case files).  Thus, the propriety of the trial court's grant of summary judgment on plaintiff's discrimination claim turns on whether plaintiff adduced " 'substantial responsive evidence' " that (1) defendant's stated reason was "untrue or pretextual," or (2) defendant otherwise "acted with a discriminatory animus." (*Serri*, *supra*, 226 Cal.App.4th at p. 862.)  Plaintiff has met this burden.

As noted above, although defendant proffered evidence to show that plaintiff was subjected to occasional criticism about the 11th floor filing room, and the other records clerk outperformed plaintiff in terms of the volume of files processed, there is no indication that plaintiff was ever informed of any required level

16

of productivity, beyond do your best. What is more, defendant decided to assess plaintiff's records room for the first time within weeks of her going out on a protected medical leave. And when defendant discovered the purportedly unacceptable backlog in the records room, no one spoke with plaintiff about the issue directly or informed her that an improvement was necessary lest she lose her job.[3] The record contains no evidence to show that anyone complained of being unable to find a file or document during plaintiff's absences. Plaintiff's superiors consistently rated her as "meeting" or "exceeding" expectations up until her last performance review in 2018. These years of positive performance evaluations plaintiff received, paired with the fact that defendant took no meaningful action to address what it suddenly found to be intolerably deficient performance, support plaintiff's contention that she had "been performing her job satisfactorily and that defendant's assessment of her work performance changed drastically only after she requested two medical leaves of absence." Indeed, when plaintiff returned from her second medical leave in March 2020, she was terminated immediately for conduct that appears to have been tolerated over a period of years and despite which she had consistently been rated as meeting or exceeding expectations. Plaintiff has raised a factual

---

[3] We agree with plaintiff that the trial court erred in sustaining defendant's objections to plaintiff's statements that no one met with her about her purported shortcomings when she returned to work in January 2019 (objection 5), and that she was told that her work performance was a serious problem for the first time in March 2020 (objection 10), as well as the objection to Fisher's deposition testimony that he had no memory of letting plaintiff know about his assessment of her record's room while she was away (objection 58).

dispute over whether defendant's purported reason for her termination was pretextual and it was acting with discriminatory animus. (See *Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570 (*Soria*) [plaintiff raised triable issue as to discrimination where she had received positive performance evaluations for years and was terminated for chronic tardiness around the same time she informed employer of a tumor that may require major surgery].)

D. *Retaliation, failure to prevent discrimination, and wrongful termination in violation of public policy*

For these causes of action, the parties do not provide arguments distinct from those made with respect to the disability discrimination claim. For all the same reasons, summary judgment was improperly granted with respect to these causes of action.

E. *Failure to accommodate and failure to engage in the interactive process*

FEHA makes it unlawful for an employer to "fail to make reasonable accommodation for the known physical or mental disability of an . . . employee" (Gov. Code, § 12940, subd. (m)) and to "fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation . . . ." (*Id.*, subd. (n)). To obtain summary judgment on a failure to accommodate cause of action, a defendant must "show that '(1) reasonable accommodation was

18

offered and refused; (2) there was simply no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith.' " (*Miller v. California Department of Corrections & Rehabilitation* (2024) 105 Cal.App.5th 261, 278.)

Plaintiff raised a triable issue of material fact as to her failure to accommodate claim. Her email dated January 28, 2019, was sufficient to place Fisher on notice that plaintiff required an accommodation because she was struggling with her work as a result of her knee surgery.[4] This notice shifted the burden to defendant to investigate and respond (*Soria, supra*, 5 Cal.App.5th at p. 599 ["an employer has a duty to take affirmative steps to accommodate the employee once it is aware an accommodation is necessary"]), which it failed to do.

The trial court also erred in granting summary judgment on plaintiff's claim for failure to engage in the interactive process. The " 'interactive process' " required under FEHA is "an informal process with the employee . . . to attempt to identify a reasonable accommodation." (*Soria, supra*, 5 Cal.App.5th at p. 600.) The record discloses no such attempt by defendant to work with

---

[4]   We agree with plaintiff that the trial court's ruling sustaining defendant's objection to this email chain (objection 77) was an abuse of discretion, as it is plainly relevant to plaintiff's claims and there is no apparent reason to exclude it from consideration.

19

plaintiff to identify an accommodation, despite plaintiff placing it on notice that one was necessary.

## III. Plaintiff's Challenges to Evidentiary Rulings

Plaintiff argues the trial court erred in sustaining various of defendant's objections to plaintiff's statements in her declaration. As stated above (see fns. 2, 3, & 4), we agree with plaintiff that the trial court abused its discretion in sustaining (1) defendant's objection to plaintiff's testimony that when she reported that she needed help, Barrett and Raizman responded that she should do what she could (objection 20), (2) defendant's objections to plaintiff's evidence that no one spoke with her about her purported shortcomings until the meeting in March 2020 after which she was promptly terminated (objections 5, 10, and 58), as well as (3) defendant's objection to the email chain between Fisher and Thompson from January 2019 (objection 77).

The other evidentiary rulings plaintiff challenges were within the trial court's discretion.[5]

---

[5] These are: the court's exclusion of evidence that (1) no one met with her before she went on leave in October 2018 to discuss her workload, (2) "no one had ever cared" about her backlog before she went on medical leave of absence, (3) plaintiff's deposition testimony that Fregoso worked with her for less than a month after her return from leave in January 2019; Fisher's testimony that (4) he did not know whether the documents he found during his visit in October 2018 entered the records room after plaintiff went on leave, (5) Fregoso began working in plaintiff's record room in the last week of November 2018 (as opposed to October), (6) Fregoso's testimony that he did not

20

## DISPOSITION

The judgment is reversed, the order granting summary judgment is vacated, and the cause is remanded for further proceedings consistent with this opinion.  Plaintiff is awarded costs on appeal.


MOOR, J.

WE CONCUR:


BAKER, Acting P. J.


KIM (D.), J.

---

remember discussing with plaintiff what he had done while she was away, or anyone telling him to speak with her about her work.