Filed 3/21/2025

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE ESTATE OF BRADLEY CHARLES ST. JOHN et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> GARY L. SCHAEFFLER et al., <br><br> Defendants and Respondents. | B329625 <br><br> (Los Angeles County Super. Ct. No. 20AVCV00127) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Stephen T. Morgan, Judge.  Affirmed.

Greene Broillet & Wheeler, Scott Carr, Christian T.F. Nickerson and Jenna Edzant; Esner, Chang, Boyer & Murphy and Stuart B. Esner for Plaintiffs and Appellants.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez and Lillian C. Harwell for Defendants and Respondents.

* * * * * *

This case involves the tragic death of a motorcyclist who struck a 300-pound pig on a rural road and then died from an ensuing collision with another vehicle. The motorcyclist's wife sued not only the tenants living on a nearby parcel of property who were raising pigs, but also the tenants' *landlords*. This appeal presents the question: When does a landlord who owns but is not in possession of property owe a duty of care to protect off-property individuals from injury due to unsecured livestock? We hold that a landlord owes a duty if (1) during the period of the tenancy, the landlord (a) actually knows that the property is in a dangerous condition (that is, that the property houses livestock and the livestock is not secured), and (b) has the right to enter the property to secure the livestock; or (2) at the time the tenancy begins or is renewed, the landlord (a) has some reason to believe the livestock might be unsecured, and (b) conducts a reasonable inspection that would reveal that the livestock is unsecured. Because the undisputed evidence in this case does not trigger the duty of care under either rule, we affirm the trial court's grant of summary judgment for the landlords.

**FACTS AND PROCEDURAL BACKGROUND**

I.     **Facts**

A.     *The accident*

Around 3 a.m. on March 7, 2019, Bradley Charles St. John (St. John) was driving his BMW motorcycle on Avenue T in an unincorporated part of Los Angeles County on the outskirts of Littlerock, California. He struck a 300-pound pig that had wandered onto the road. St. John was then struck by another motorist. St. John died from his injuries.

2

## B.    *The property*

At the time of the accident, Gary and Judy Schaeffler (the Schaefflers) owned a just-over-two-acre parcel of land near the site of the accident (the property).  A chain-link fence ran along the perimeter of the property, with a solitary gate to provide access.

Although the Schaefflers were the sole owners of the property since 2015, they never occupied it.  Instead, since 2014 or 2015, Judy's brother and sister-in-law, Michael and Suzanne Mountjoy (the Mountjoys), along with their children and a grandchild, had lived on the property under an oral lease.[1]  Under the lease, the only payments the Mountjoys had to make were $275 per month to the Schaefflers (to cover the property taxes) and to pay the utilities for the property.  In exchange, the Mountjoys were tasked with "maintain[ing]" and "upkeep[ing]" the property, which included "maintenance of fences and things of that nature"; the Mountjoys were to make any repairs themselves or, if the repairs were too expensive, to let the Schaefflers know what needed to be fixed.

At some point after the Mountjoys took possession of the property, they installed a chain-link pen in the backyard and started raising goats and pigs.  The Mountjoys knew that "little baby pigs" would sometimes dig under the pen, and the Mountjoys would "patch" up any attempts to burrow under the pen.  This was consistent with the Mountjoys' understanding that it was their job under the oral lease to "make sure that the fence

---

[1]    The Schaefflers co-owned the property with Judy's parents until they passed away; the original lease was between Judy's parents and the Mountjoys.

area and pen areas were maintained so that animals couldn't escape."

The Schaefflers knew that the Mountjoys were raising pigs on the property. During the two or three times the Schaefflers would make "familial visits" every year, Gary would "pa[y] attention to" and "look[] at" the perimeter fence and Judy would "take a look at" the pen. Gary saw the perimeter fence "was in good working order," and Judy never saw any issues "with the [pen] that caused [her] concern that an animal might escape." The Mountjoys never asked the Schaefflers for any assistance in repairing either enclosure.

Photographs taken of the fences in 2022 (that is, three and a half years after St. John's accident) depicted signs of attempted burrowing at the base of the perimeter fence, and the perimeter fence was "in some degree of disrepair" because there were areas where it was not properly secured to posts or rails, there were some areas where segments of the chain link were layered on top of each other, and there were other areas where plywood, rocks, bricks, and an indoor baby gate were used as reinforcements. Other photos from 2022 showed that the base of the pen's fence had been layered with plywood, rocks, and debris. Based on these photographs and an inspection conducted at the same time, an expert in "porcine care, management, and safety" (and who had expertise in "animal enclosures") opined that the perimeter fence "fell below the standard of care" because it was not built to the specifications the expert would expect.[2]

---

[2] The trial court excluded the expert's opinions regarding defects with the pen's fence after finding an absence of evidence that the pen was in the same condition at the time of St. John's death over three years earlier.

4

## II. Procedural Background

St. John's widow (plaintiff)—on behalf of St. John's estate and on her own behalf for a survival claim—sued the Schaefflers and the Mountjoys for negligence based on a breach of the duty to "properly own, main[tain], permit, service, repair, control, supervise and/or operate their property and to not allow their pigs to escape from their property."[3]

The Schaefflers moved for summary judgment on plaintiff's operative first amended complaint on the ground that they, as out-of-possession landlords, owed no duty of care to St. John.[4] After a full round of briefing and a hearing, the trial court granted summary judgment on the ground that the Schaefflers owed St. John no duty of care because they lacked "actual knowledge" of any dangerous condition on the property.[5]

---

[3] Plaintiff initially named only the Schaefflers and Judy's parents as the defendants responsible for the property, but the parents were later dismissed and the Mountjoys were later substituted for Doe defendants.

Plaintiff also asserted a negligence claim against the motorist who struck St. John following his collision with the pig; the motorist is not a party to this appeal.

The parties brought various cross-complaints against one another, but none of the cross-claims are at issue in this appeal.

[4] The Schaefflers also argued that the pig that caused the accident was not one of the Mountjoys' pigs. In light of our disposition of the duty issue, we need not address this further ground.

[5] Plaintiff filed a motion for new trial challenging the summary judgment. After a round of briefing and a hearing, the court denied the motion. Plaintiff does not challenge that ruling on appeal, so we do not discuss it further.

Plaintiff filed this timely appeal.

**DISCUSSION**

Plaintiff argues that the trial court erred in granting summary judgment for the Schaefflers on the ground that they, as landlords, owed no duty of care to St. John. We independently review the grant of summary judgment as well as the legal question of whether a duty is owed. (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273 [summary judgment]; *Quelimane Co v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 57 [duty of care]; *Johnson v. Prasad* (2014) 224 Cal.App.4th 74, 79 ["'The existence of [a] landlord's duty to others to maintain the property in a reasonably safe condition is a question of law for the court'"], quoting *Sturgeon v. Curnutt* (1994) 29 Cal.App.4th 301, 305.) We review the trial court's ruling, not its rationale. (E.g., *Scheer v. Regents of University of California* (2022) 76 Cal.App.5th 904, 913.)

**I.    Pertinent Law**

    **A.    *Law of summary judgment***

A defendant is entitled to summary judgment if they can "show that there is no triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) The defendant bears the initial burden of establishing that the plaintiff's cause of action has "no merit" by showing that the plaintiff cannot establish "[o]ne or more elements of [her] cause of action." (*Id.*, subd. (p)(2).) If this burden is met, the "burden shifts" to the plaintiff "to show that a triable issue of one or more material facts exists as to [that] cause of action." (*Id.*, subd. (p)(2); see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

6

**B.** *The duty of care, generally*

Before a defendant can be held liable in negligence for injuries arising out of a dangerous condition on property he owns, the plaintiff must establish that (1) the defendant owes the plaintiff a duty of care, (2) the defendant breached that duty, and (3) that breach proximately caused the plaintiff's injury. (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158 (*Kesner*); *QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 998 [""""[T]he existence of a duty"""" of care running from the defendant to the plaintiff is """"[t]he threshold element of a cause of action for negligence"""""], quoting *Paz v. State of California* (2000) 22 Cal.4th 550, 559.)

"Whether a particular defendant owes a particular plaintiff a legal duty of care (actionable in a claim for negligence) is, at bottom, a 'question of public policy'—namely, *should* that plaintiff's interests be entitled to legal protection against the defendant's conduct?" (*Shalghoun v. North Los Angeles County Regional Center, Inc.* (2024) 99 Cal.App.5th 929, 943, quoting *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 627-628.) To answer this question, courts must ask: (1) Does the defendant owe the plaintiff a legal duty of care under traditional principles of tort law and, if so, (2) do the relevant public policy considerations set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), nevertheless favor "limiting that duty"? (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 209, 218-219.)

The considerations set forth in *Rowland* fall into two broad categories—namely (1) foreseeability-related factors, and (2) other "public policy factors." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 774, 781.) *Rowland*'s three foreseeability-

7

related considerations are (1) "the foreseeability of harm to the plaintiff," (2) "the degree of certainty that the plaintiff suffered injury," and (3) "the closeness of the connection between the defendant's conduct and the injury suffered." (*Rowland*, *supra*, 69 Cal.2d at p. 113; see *Cabral*, at p. 774.) *Rowland*'s four public policy considerations are (1) "the policy of preventing future harm," (2) "the moral blame attached to the defendant's conduct," (3) "the extent of the burden to the defendant and [the] consequences to the community of imposing a duty to exercise care with resulting liability for breach," and (4) "the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, at p. 113; see *Cabral*, at p. 781.)

### C. *The duty of care owed by landlords*

#### 1. *The duty of landowners under traditional principles of tort law*

As landowners, landlords have a common law duty "to maintain land in their possession and control in a reasonably safe condition" "as to avoid exposing others to an unreasonable risk of injury." (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 674, overruled on other grounds, *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 527 (*Reid*); *Barnes v. Black* (1999) 71 Cal.App.4th 1473, 1478; *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156 (*Alcaraz*); *Swanberg v. O'Mectin* (1984) 157 Cal.App.3d 325, 329 (*Swanberg*) [landowners have "an affirmative duty to exercise ordinary care to keep the premises in a reasonably safe condition," italics omitted]; see generally Civ. Code, § 1714, subd. (a) [codifying the common law duty].) This duty "'is not limited to injuries that occur on premises owned or controlled by the landowner'"; it also "'encompasses a duty to avoid exposing persons to risks of injury that occur off site if the landowner's

8

property is maintained in such a manner as to expose persons to an unreasonable risk of injury offsite.'" (*Kesner, supra,* 1 Cal.5th at p. 1159, quoting *Garcia v. Paramount Citrus Assn., Inc.* (2008) 164 Cal.App.4th 1448, 1453 and *Barnes*, at p. 1478.)  As pertinent here, a landowner "may be held liable for negligently allowing livestock to escape from [their] property onto a highway." (*Davert v. Larson* (1985) 163 Cal.App.3d 407, 410.)

            2.      *Limitations on that duty for out-of-possession landlords*

      Unlike other owners of property, landlords typically surrender possession and control over their property to their tenants, and those tenants have a reciprocal right to quiet enjoyment of that property without undue interference from the landlords.  (*Uccello v. Laudenslayer* (1975) 44 Cal.App.3d 504, 511 (*Uccello*) ["'In the absence of agreement to the contrary, the lessor surrenders both possession and control of the land to the lessee, retaining only a reversionary interest; and he has no right even to enter without the permission of the lessee"].)[6]  These out-

---

**6**      Of course, landlords do not inevitably surrender control over the totality of the property:  Sometimes, landlords retain control over the common areas or fixtures on their property (*Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, 259-260 (*Brown*) [elevator]; *Johnston v. De La Guerra Properties, Inc.* (1946) 28 Cal.2d 394, 399-400 [walkways]; *Uccello, supra,* 44 Cal.App.3d at p. 511), or otherwise "covenant[] or volunteer[]" to retain control so that they can "repair a defective condition on the premises" (*Uccello,* at p. 511; *Scholey v. Steele* (1943) 59 Cal.App.2d 402, 405); other times, statutes or ordinances concerned with safety supplant the common-law duties, at least as to the "class of persons" the statute is "designed" to protect (*Grant v. Hipsher* (1967) 257 Cal.App.2d 375, 381; *Uccello,* at p. 511).  These situations are not implicated here.  (Cf. Food & Agr.

9

of-possession landlords still owe a duty of care.  (*Wylie v. Gresch* (1987) 191 Cal.App.3d 412, 418 [a landowner's duty of care "now applies to owners out of possession"].)  But a landlord's lack of possession—and the concomitant lack of control over the property—alters the scope of that duty of care.  (*Preston v. Goldman* (1986) 42 Cal.3d 108, 119 ["we have placed major importance on the existence of possession and control as a basis for tortious liability for conditions on the land"]; *Salinas v. Martin* (2008) 166 Cal.App.4th 404, 412 (*Salinas*) ["Because a landlord has relinquished possessory interest in the land, his or her duty of care to third parties injured on the land is attenuated as compared with the tenant who enjoys possession and control"]; cf. *Alcaraz, supra*, 14 Cal.4th at p. 1160 ["'Whoever controls the land is responsible for its safety'"]; *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134 ["A defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control"].)

Not surprisingly, the pertinent public policy considerations set forth in *Rowland* dovetail neatly with the need for curtailment of a landlord's duty of care vis-à-vis landowners in general, at least when the landlord is not in possession or control of the property.  In this context, the connection between the landlord's conduct and the plaintiff's injury is less close because it is the *tenant*—not the *landlord*—who is in possession and control of the property.  (*Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 177 ["The '"crucial element"' for imposing a duty

Code, § 16902 [obligating the "person that owns or controls the possession of any livestock"—not the underlying landowner—not to "permit any of the livestock to stray upon . . . a public highway"].)

10

. . . is control"]; *Alcaraz, supra*, 14 Cal.4th at p. 1160.) What is more, the not-in-possession (and hence not-in-control) landlord is less morally blameworthy for injuries caused by dangerous conditions on the property. (*Garcia v. Holt* (2015) 242 Cal.App.4th 600, 604 (*Garcia*) ["It would not be reasonable to hold a lessor liable if the lessor did not have the power, opportunity, and ability to eliminate the dangerous condition"]; *Mora v. Baker Commodities* (1989) 210 Cal.App.3d 771, 780 (*Mora*) [same].)[7] Further, the consequences of imposing a duty upon landlords are much higher because such a duty would obligate landlords to micromanage their leased properties, thereby interfering with their tenants' quiet enjoyment of that property. (*Salinas, supra*, 166 Cal.App.4th at p. 412 ["'Limiting a landlord's obligations releases it from needing to engage in potentially intrusive oversight of the property, thus permitting the tenant to enjoy its tenancy unmolested'"], quoting *Stone v. Center Trust Retail Properties, Inc.* (2008) 163 Cal.App.4th 608, 612 (*Stone*).)

_____

[7] This is particularly true in cases where the property did not become dangerous until *after* the landlord surrendered possession and control. (*Uccello, supra*, 44 Cal.App.3d at p. 510 ["Historically, the public policy of this state generally has precluded a landlord's liability for injuries to his tenant or his tenant's invitees from a dangerous condition on the premises which comes into existence after the tenant has taken possession"]; *Garcia, supra*, 242 Cal.App.4th at p. 604 [same]; cf. *Glenn R. Sewell Sheet Metal, Inc. v. Loverde* (1969) 70 Cal.2d 666, 672 ["lessee who voluntarily puts the premises to uses different from those to which they were put before the creation of his tenancy . . . must bear the burden of conforming his new use to the requirements of the law . . ."].)

Courts have effectuated the different public policy calculus for landowners who are not in possession of the property by fashioning two rules governing the scope of such landlords' duty of care to third parties, each applying at a different point throughout the tenancy.[8]

        a.      During the life of the tenancy

If a dangerous condition on the property arises during the tenancy—and hence while the tenant and not the landlord is in possession and control of the property—the landlord owes a duty of care to third parties injured by that dangerous condition only if (1) the landlord has actual knowledge of that condition, and (2) the landlord has retained a "right and ability to reenter" the property to "obviate the presence of the dangerous [condition]." (*Mora*, *supra*, 210 Cal.App.3d at p. 782, fn. 8; *Resolution Trust Corp. v. Rossmoor Corp.* (1995) 34 Cal.App.4th 93, 101 (*Resolution Trust*); *Kaney v. Custance* (2022) 74 Cal.App.5th 201, 216-217; *Day v. Lupo Vine Street L.P.* (2018) 22 Cal.App.5th 62, 69; *Salinas*, *supra*, 166 Cal.App.4th at p. 412; *Stone*, *supra*, 163 Cal.App.4th at p. 612; *Chee v. Amanda Goldt Property Management* (2006) 143 Cal.App.4th 1360, 1369-1370 (*Chee*); *Lundy v. California Realty* (1985) 170 Cal.App.3d 813, 821; *Rosales v. Stewart* (1980) 113 Cal.App.3d 130, 134-135; *Uccello*, *supra*, 44 Cal.App.3d at pp. 511-514; see generally CACI No. 1006

---

8      Different considerations apply when examining the landlord's duty of care toward their own tenant(s) (see *Becker v. IRM Corp.* (1985) 38 Cal.3d 454, 467, overruled on other grounds, *Peterson v. Superior Court* (1995) 10 Cal.4th 1185), or when examining a landlord's duty of care if the property is a commercial property open to the public (*Portillo v. Aiassa* (1994) 27 Cal.App.4th 1128, 1132, 1135-1136; *Mora, supra,* 210 Cal.App.3d at pp. 781-782 & fn. 8; *Becker*, at p. 463).

[third paragraph].)  Actual knowledge may be established by "direct evidence" that the landlord "actually knew" of the dangerous condition or by "circumstantial evidence" indicating "that the landlord must have known" of the condition;[9] evidence that the landlord "should have known" of the condition is not enough.  (*Fraser v. Farvid* (2024) 99 Cal.App.5th 760, 763, 769 (*Fraser*); *Donchin v. Guerrero* (1995) 34 Cal.App.4th 1832, 1838-1839; *Uccello*, at p. 514, fn. 4.)  This more modest duty of care seeks to balance the out-of-possession landlord's lack of possession and control against the "socially and legally unacceptable" outcome of "permit[ing] a landlord" to "sit idly by in the face of [a] known danger to others" that the landlord has the power to stop.  (*Uccello*, at p. 512.)

    b.  When the tenancy begins or is renewed

 Because a landlord has the right to enter property (and thus has possession and control over that property) when initiating or renewing a lease, a landlord owes a greater duty to third parties injured by dangerous conditions existing on the property *at those moments in time*.  (*Burroughs v. Ben's Auto Park, Inc.* (1945) 27 Cal.2d 449, 453-454 ["An agreement to renew a lease or relet the premises does not deprive the lessor of the right of reentry on the expiration of the old term and consequently cannot relieve the lessor of his duty to see that the premises are reasonably safe at that time"]; *Brantley v. Pisaro*

---

**9** Thus, a landlord who helps create the dangerous condition has a duty to correct it.  (E.g., *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1137, superseded by statute on other grounds as stated in *Rufini v. CitiMortgage, Inc.* (2014) 227 Cal.App.4th 229.)

(1996) 42 Cal.App.4th 1591, 1605-1606; *Dennis v. Orange* (1930) 110 Cal.App. 16, 22-23; CACI No. 1006 [first paragraph].)

At these specific moments in time, a landlord has a duty (1) to conduct a reasonable inspection of the property *if* the landlord has a "reason to know" there may be a dangerous condition on the property at that time, and (2) to repair, if that inspection reveals a dangerous condition. (*Oh v. Teachers Ins. & Annuity Assn. of America* (2020) 53 Cal.App.5th 71, 86; *Garcia, supra*, 242 Cal.App.4th at p. 605; *Resolution Trust, supra*, 34 Cal.App.4th at pp. 102-103 & fn. 8; *Mora, supra*, 210 Cal.App.3d at pp. 780-781; see *Granucci v. Claasen* (1928) 204 Cal. 509, 512-513 [landlord owed duty to repair a driveway that "was in a state of disrepair" at time tenancy began]; *Swanberg, supra*, 157 Cal.App.3d at pp. 328-3321 [landlord owed duty to repair overgrown shrubbery "easily viewed from the outside" of the "perimeter[]" "of the property" over the course of several tenancies which it "should have anticipated"].) Because "[t]he landlord's obligation is only to do what is reasonable under the circumstances," and because what is reasonable turns on "[t]he burden of reducing or avoiding the risk [of harm] and the likelihood of injury," a "landlord need not take extraordinary measures or make unreasonable expenditures of time and money in trying to discover hazards unless the circumstances so warrant." (*Resolution Trust*, at pp. 102-103; *Oh*, at p. 86; see generally *Evans v. Thomason* (1977) 72 Cal.App.3d 978, 984-985 ["criteria for determining whether a landlord acted with ordinary care in the management of [the] property are: [(1)] the likelihood of injury, [(2)] the probable seriousness of such injury, [(3)] the burden of reducing or avoiding the risk, and [(4)] [the landlord's] degree of control over the risk-creating defect"].) Because a landlord at these moments

14

in time sometimes has a duty to conduct a "reasonable inspection," such a landlord is accordingly charged not only with what they actually knew but also with what they constructively knew (that is, what they "should have known" by virtue of the inspection) (CACI No. 1006 [first and second paragraphs]; Rest.2d Torts, §§ 379, 379A; see *Uccello*, *supra*, 44 Cal.App.3d at p. 511 [landlord liable for defects it knew about but did not disclose to tenant and for nuisances existing on the property at the time the lease is made or renewed]); thus, the landlord's duty of care at these moments in time is more onerous than the duty of care extant during the tenancy itself, which, as noted above, makes a landlord's duty to act contingent upon the landlord's actual knowledge and the power and ability to correct the dangerous condition.

## II. Analysis

Applying these principles, the trial court correctly granted summary judgment to the Schaefflers.

As a threshold matter, it is undisputed that (1) the property was occupied by the Mountjoys for years prior to the accident that killed St. John, (2) the Schaefflers had been out-of-possession landlords during that time, and (3) the dangerous condition that precipitated St. John's death arose from the *combination* of having pigs on the property *plus* the failure to secure those pigs. (Cf. *Fraser*, *supra*, 99 Cal.App.5th at p. 763 [when a dog on the property is ferocious, dangerous condition is dog's dangerousness].)

The Schaefflers did not owe a duty of care to St. John during the Mountjoys' tenancy. The Schaefflers knew that there were pigs on the property, but it is undisputed that the Schaefflers did not actually know that the pigs were unsecured.

15

This lack of actual knowledge precludes the imposition of any duty during the tenancy.

The Schaefflers also did not owe a duty of care to St. John at the moments in time when their lease with the Mountjoys was renewed. Here, the oral lease between the Schaefflers and Mountjoys was renewed every month because their lease set a monthly amount due and because there was no evidence that they agreed to a different term of the lease. (Civ. Code, §§ 1943, 1944; *65283 Two Bunch Palms Building LLC v. Coastal Harvest II, LLC* (2023) 91 Cal.App.5th 162, 170 [parties' intent can override presumptive terms set by statute].) However, the Schaefflers at none of these monthly renewals had any "reason to know" that there may be a dangerous condition on the property— that is to say, they had no "reason to know" that the pigs were unsecured.[10] It is undisputed that the Schaefflers, when they would visit the property during the period at issue, never saw any holes, gaps or burrows in the pen or perimeter fences. Because they had no reason to know the pigs were not secured, their duty to conduct a more thorough reasonable inspection of the property was never triggered. To be sure, plaintiff's expert opined that the perimeter fence "fell below the standard of care" for pig enclosures and that a "cursory inspection" "would have revealed" the defects in the perimeter fence. But this opinion reveals, at most, that a reasonable inspection would have uncovered certain "defect[s]" in that fence. It does not address the precursor question whether those defects would have given a

---

**10** Because the Schaefflers never had a "reason to know" of a dangerous condition at any point in time, we need not grapple with the dissent's concern about precisely when a duty to inspect might arise vis-à-vis the actual renewal date of a lease.

landowner *without* expertise and specialized knowledge in porcine management reason to know that the pigs were unsecured and hence that an inspection was necessary in the first place. *That* is the critical question. The trial court also had no evidence that there were any defects in the *pen*—and there would have to be defects in *both* fences before there could be a dangerous condition on the property by virtue of escaping livestock.

## III.   Plaintiff's Arguments

Plaintiff levels more than a dozen challenges to the summary judgment ruling. They fall into three groups.

### A.   *Arguments regarding the appropriate duty of care*

Plaintiff makes seven arguments urging us to adopt a different duty of care for the Schaefflers.

First, plaintiff argues—and the dissent agrees—that the lease between the Schaefflers and the Mountjoys is not a "typical lease" giving rise to a "traditional landlord-tenant relationship" because (1) it is oral, (2) it is between family members, (3) its terms require the Mountjoys to pay, as rent, only an amount necessary to cover property taxes and utilities and to maintain the property (except when repairs are so expensive that the Schaefflers would need to step in and pay for them), and (4) the Schaefflers, during their "familial visits," would also "check on the property." Citing these attributes, plaintiff and the dissent assert that the Schaefflers should not be treated as out-of-possession landlords.

We disagree. To be sure, the lease between the Schaefflers and the Mountjoys might not be an archetypical, arm's length lease between strangers. But it is not atypical in a way that

17

matters to the *Rowland* policy analysis that defines the applicable duty of care.  None of the facts cited by plaintiff and the dissent *individually* affects the *Rowland* analysis.  As we explained above, out-of-possession landlords bear a less onerous duty of care under *Rowland* because they lack possession and control of the leased premises and because imposing a more onerous duty would interfere with the tenant's quiet enjoyment.  Whether a lease is oral or written, or is between family members, affects neither the degree of the landlord's control nor the threat to the tenant's quiet enjoyment.  The amount of the agreed-upon rent also does not bear on the *Rowland* analysis, as courts rarely "inquire into the adequacy of consideration" at all.  (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 679 [noting "'general contract principle that courts should not inquire into the adequacy of consideration'"].)  But even if we were to inquire, the Mountjoys still paid rent—namely, a monthly amount ($275)[11] and utilities, plus their "in kind" labor to maintain the property.  The Schaefflers' offer to conduct costly repairs does not alter the precursor duty to inspect the fences on the property, which, as noted above, is only triggered if the Schaefflers had "reason to know" the fences posed a dangerous condition and the undisputed evidence showed they did not.  And the Schaefflers' familial visits two or three times a year do not show they retained control over the property sufficient to deem them to be in possession.  Viewing the facts cited by plaintiff and the dissent *collectively*, while appropriate, also does not alter the bottom-line analysis that the Mountjoys were tenants who resided on the property for years with only occasional visits from the Schaefflers; the Schaefflers

---

[11]    That the Mountjoys knew this amount covered the property taxes is irrelevant.

18

were not in possession. While plaintiff and the dissent recast the Schaefflers' "familial visits" as "periodic inspection visits" and recast the Mountjoys' years of raising their family on the property as "effectively" acting as "rent-free caretakers" who never "fully ceded control," these recharacterizations do not reflect the reality of the relationship between the Schaefflers and the Mountjoys established by the record or alter the *Rowland* analysis.

Second, plaintiff argues that the Schaefflers remain liable for any injuries to third parties arising from dangerous conditions on their property because a landowner's duty of care is nondelegable. Plaintiff is correct that a landlord's duty of care is nondelegable insofar as a landlord cannot, through provisions in the lease at issue, divest itself of the duty of care. (*Brown*, *supra*, 23 Cal.2d at p. 260 ["The duty which a possessor of land owes to others to put and maintain it in reasonably safe condition is nondelegable"]; *Swanberg*, *supra*, 157 Cal.App.3d at p. 329 [same]; *Jessen v. Sweigert* (1884) 66 Cal. 182, 183 [same].) But summary judgment is warranted in this case, not because the Schaefflers have *no* duty of care by virtue of their lease, but instead because the undisputed facts in this case do not trigger that duty of care as to St. John.[12]

Third, plaintiff argues that the Schaefflers are just as liable as the Mountjoys for any negligence because a tenant is a

_____

12      Thus, the dissent's citation to *Brown*, *supra*, 23 Cal.2d at p. 260—where the court held that a landlord could not avoid liability for a tenant's fall in an elevator shaft by delegating its duty to upkeep the elevator to an independent servicer—does not aid the dissent's assumption that the Mountjoys were caretakers and the Schaefflers therefore owed a duty to St. John.

19

landlord's agent. Plaintiff is incorrect. (*O'Leary v. Herbert* (1936) 5 Cal.2d 416, 418 ["a landlord is not liable for acts of negligence of tenants"]; *Chee*, *supra*, 143 Cal.App.4th at p. 1375 ["the negligence of a tenant 'cannot be imputed to the landlord'" by virtue of "vicarious[] liab[ility]"].) Plaintiff alternatively argues that the oral nature of the lease "supports an inference of an agency relationship," but this proposition is also unsupported by the law.

Fourth, plaintiff argues that the Schaefflers' conduct in looking at the pen or perimeter fences during their every-so-often social visits to the property either (a) constitutes an undertaking to maintain those fences or (b) effectively converted the Schaefflers' *right* to inspect the property into a *duty* to inspect the property (and thus precludes them from arguing that the duty to inspect the fences was not triggered). Neither argument is grounded in precedent. Although "an independent safety consultant rendering services for compensation" to an employer that undertakes a safety inspection can be liable to employees under a negligent undertaking theory if that inspection is negligently conducted (*Peredia v. HR Mobile Services, Inc.* (2018) 25 Cal.App.5th 680, 689-700), the Schaefflers' inspections of the fences were occasional, voluntary, and uncompensated. And it is well settled that a *right* to inspect does not, without more, impose a *duty* to inspect. (*Mora*, *supra*, 210 Cal.App.3d at pp. 780-781 [landlord's retention of a "right to enter the premises to inspect and make repairs" is not an "obligation" unless the landlord "ha[s] some reason to know there [is] a need for such action"].) Although the Schaefflers' occasional inspections made it more likely that they might come to have a "reason to know" the fences posed a dangerous condition, that likelihood did not come to pass

20

because the undisputed facts showed that the inspections revealed the fences not to pose such a condition.

Plaintiff's reliance on cases in which a party's conduct can help give meaning to a contract's terms (e.g., *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 752-753; *Southern Pacific Transportation Co. v. Santa Fe Pacific Pipelines, Inc.* (1999) 74 Cal.App.4th 1232, 1242) is misplaced.

Fifth, plaintiff argues that the Schaefflers had a duty to inspect the perimeter fence, even if they lacked any reason to know the disrepair of the fence might constitute part of a dangerous condition on the property, because the pertinent public policy concerns under *Rowland* extend no further than safeguarding a tenant's quiet enjoyment of the property; thus, plaintiff reasons, landlords *must* conduct any and all inspections that do not disturb their tenants' quiet enjoyment. Plaintiff cites no authority in support of this argument. This is not surprising, because it is contrary to the legion of case law defining an out-of-possession landlord's duty of care. To the extent plaintiff invites us to re-balance the *Rowland* factors to articulate a different duty of care, we decline the invitation because the re-balancing plaintiff envisions wholly ignores the burden on the landlord of conducting inspections, even as to inspections that might not disturb a tenant's quiet enjoyment. (See *Salinas, supra,* 166 Cal.App.4th at p. 412; *Stone, supra,* 163 Cal.App.4th at p. 612.)

Sixth, plaintiff argues that *Swanberg* dictates a ruling in her favor. We disagree. *Swanberg* held that a landlord's duty of care to protect third parties on a road encompassed, in that case, a duty to maintain shrubbery that had grown during several tenancies and that blocked the view of the road for persons exiting the property. (*Swanberg, supra,* 157 Cal.App.3d at pp.

21

327-328.)  In reaching this holding, *Swanberg* stated that a landlord "has an *affirmative duty* to exercise ordinary care to keep the premises in a reasonably safe condition, and therefore must *inspect* them or take other proper means to ascertain their condition." (*Id.* at p. 330.)  Read in conjunction with *Swanberg*'s observation that the court need "not . . . consider" whether the overgrowth was visible "at the time [the landlords] last rented their property" (*id.*, at p. 332), this language in *Swanburg* could be read as imposing upon landlords a perpetual duty to inspect their property, which would depart from the duty of care explained above requiring landlords to inspect only upon a lease's renewal and only if there is a "reason to know" there may be a dangerous condition on the property.  To the extent this verbiage in *Swanburg* is inconsistent with the general rule, we decline to follow it.  However, *Swanburg*'s result is consistent with the general rule:  *Swanberg* ultimately declares the landlord liable because the landlord "should have anticipated th[e] plant growth," and thus had a "reason to know" there would be a dangerous condition on the property at the time of any renewals—even if the court did not need to consider precisely when those renewals occurred. (*Id.* at p. 332.)  Here, however, the Schaefflers would have no reason to anticipate or to know that a pig would escape either fence *until* a duty to inspect was triggered.

Seventh and lastly, plaintiff argues that the duty of care rules that look to a landlord's actual knowledge arose in the context of domestic pets (such as vicious dogs) rather than roaming livestock, and urges us to adopt different rules governing the duty of care for roaming livestock.  Again, plaintiff cites no precedent that supports such a distinction.  More to the

point, she offers no explanation of why the *Rowland* factors would favor a different duty of care for roaming livestock.

**B.** ***Arguments regarding the burden of proof on summary judgment***

Plaintiff urges that summary judgment should not have been granted because the Schaefflers never met their initial burden of disproving an element of her negligence claim, such that the burden never shifted to plaintiff to show a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar*, *supra*, 25 Cal.4th at p. 849.) To carry their initial burden, the Schaefflers needed to negate an element of plaintiff's sole claim for negligence. The Schaefflers carried this burden by establishing that they owed St. John no duty of care because (1) they lacked actual knowledge that the pen and perimeter fences presented a dangerous condition and (2) they had no reason to know that the fences presented such a condition (and hence had no duty to inspect the fences). Plaintiff urges that the Schaefflers never established that they had no reason to know the fences were a dangerous condition because their dangerousness could be inferred from the happening of the accident itself; for support, she cites *Kenney v. Antonetti* (1931) 211 Cal. 336, 339-340. Our Legislature has since abrogated *Kenney*, displacing it with a statute providing that "there is no presumption or inference that" a "collision between any motor vehicle and any domestic animal on a highway" "was due to negligence on behalf of the owner or the person in possession of the animal." (Food & Agr. Code, § 16904; accord, *Pepper v. Bishop* (1961) 194 Cal.App.2d 731, 732-734 [discussing abrogation].)

23

**C.     *Arguments regarding whether the duty of care has been triggered***

Plaintiff offers three further arguments regarding whether the Schaefflers' duty of care was triggered, as that duty is defined above.

First, plaintiff argues that the Schaefflers never established that they conducted a proper inspection of the pen or perimeter fences.  This is true but irrelevant.  As noted above, the duty to inspect is only triggered when a lease begins or is renewed and, even then, only when the landlord has a reason to know there is a dangerous condition on the property.  (E.g., *Resolution Trust*, *supra*, 34 Cal.App.4th at pp. 102-103 & fn. 8.)  Because the undisputed facts show that the duty to inspect was never triggered here, the absence of an inspection by the Schaefflers is of no consequence.

Second, plaintiff argues that the trial court erred in excluding those portions of her expert's declaration opining that the pen had defects.  The court excluded those portions after finding they were based on the expert's observations of the pen in October 2022, more than three years after the accident at issue and without any other evidence that the pen was in the same condition three-plus years earlier.  Whether we review this evidentiary ruling de novo or for an abuse of discretion (*Reid*, *supra*, 50 Cal.4th at p. 535), the court did not err in excluding this evidence.  That is because, absent proof that the pen was in the same condition at the time of the expert's observation as it was at the time of the accident, the expert's opinion about the pen's resilience to escape attempts by pigs at the time of the accident would lack any factual foundation.  (See, e.g., *Clary v. City of Crescent City* (2017) 11 Cal.App.5th 274, 296 [noting how

24

"a nuisance . . . can become worse or can be abated in whole or part with the passage of time"].)  Although the Mountjoys testified that they had not "made any changes" to the pen since the time of the accident other than "[n]ormal maintenance to make sure that . . . it's still sound," that testimony was given during a September 2021 deposition; more to the point, there was still a one-year gap until the expert's observations and plaintiff failed to establish that the condition of the pen remained the same during that gap of time.

Third and lastly, plaintiff argues that the trial court should have excluded the Schaefflers' deposition testimony indicating that the fences were in "good working order" because that testimony constituted an impermissible lay opinion on the ultimate issue.  We will not entertain this argument because plaintiff forfeited it by not objecting on this ground before the trial court.  (Evid. Code, § 353.)

## DISPOSITION

The judgment is affirmed.  The Schaefflers are entitled to their costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, P. J.
HOFFSTADT


I concur:


_____, J.
 KIM (D.)

25

Estate of Bradley Charles St. John et al. v. Gary L. Schaeffler et al.
B329625


BAKER, J., Dissenting


"No answer is what the wrong question begets . . . ."
(Bickel, The Least Dangerous Branch: The Supreme Court at the Bar of Politics (2d ed. 1986) p. 103.)

The majority constructs an abstract legal framework derived from its survey of caselaw and then deploys that framework to make quick work of defeating tort liability for Bradley Charles St. John's (St. John's) death. The fault with this lies in its foundation. In spending much of its time reciting facts and holdings in prior landlord liability cases, the majority never truly grapples with the real question St. John's estate presents for decision: whether the features of this case and the oral lease arrangement involved reveal typical landlord liability principles should not apply.

As I proceed to explain, the answer to that question is they should not. The evidence in this case readily permits a conclusion that Judy Schaeffler and Gary Schaeffler were far from typical landlords. Most critically, there is compelling evidence they never fully ceded control of the premises to the family members they selected as effectively rent-free caretakers for the property in question. That means the Schaefflers continued to owe a nondelegable duty of care to St. John, and summary judgment in their favor was unwarranted.

I

The majority's duty of care analysis reviews "[t]he duty of landowners under traditional principles of tort law" and "[l]imitations on that duty for out-of-possession landlords." It is not necessary for me to review or critique the majority's discussion of case law in this area because we agree on the one point that matters. As the majority puts it, it is a typical landlord's "lack of control over the property . . . [that] alters the scope of th[e] duty of care." (See, e.g., *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1160 ["Whoever controls the land is responsible for its safety"]; *Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 177 ["The '"crucial element"' for imposing a duty . . . is control [citation], the rationale being that whoever has the means to control the property can take steps to prevent the harm"]; see also *Public Utilities Com. v. Superior Court* (2010) 181 Cal.App.4th 364, 378 [control turns on whether the defendant had the power to "prevent, remedy or guard against the dangerous condition"].) The majority believes this focus on control makes sense because it avoids requiring landlords "to micromanage their leased properties, thereby interfering with their tenants' quiet enjoyment of that property." For ordinary landlord-tenant relationships, I do not disagree.[1]

---

[1]     From these general principles, the majority fashions two "rules" to govern all questions of landlord liability. The majority says an out-of-possession landlord owes a duty of care for a dangerous condition on the property if (1) the landlord has actual notice of the condition and retains the right and ability to reenter the property to fix it, or (2) the landlord has reason to believe there may be a dangerous condition at the time when a lease is

2

## II

The record in this case includes evidence—some even undisputed—that the Schaefflers were anything but ordinary landlords when it comes to the critical issue of control over the property. First, there is the nature of the lease itself: it was not a formal, written arrangement but rather an asserted oral, month-to-month agreement. Second, there are the tenants involved: they were not strangers who came to lease the property by way of some market-based process; instead, they are family—Judy Schaeffler's brother and his wife, kids, and a grandchild (the Mountjoys). Third, there are terms of the oral lease: the Mountjoys did not have to pay rent on the roughly two-acre

---

up for renewal and the landlord may accordingly inspect the property. According to the majority, this inspection at the time of renewal rule is sensible because "a landlord has the right to enter property (and thus has possession and control over that property) when initiating or renewing a lease" and therefore "owes a greater duty to third parties injured by dangerous conditions" that are then existing.

The majority does not explain how its "at the time of renewal" rule practically works in case of a month-to-month tenancy like the one involved in this case, however. Can a landlord inspect the property only on the actual renewal date, or is there some number of days before or after that date on which an inspection may be reasonably made? Assuming (as seems warranted) that it is the latter, there may be a great many days over the course of a year when a landlord retains control over the property such that the landlord's duty of care is not limited—and perhaps one of those days was the day St. John was fatally injured (though, again, the majority does not say). As I will explain, I need not consider how this practical question impacts the duty of care in this appeal because the Schaefflers exercised even greater control over the property.

3

property in any meaningful sense; instead, they were responsible for paying only an amount sufficient to cover the property taxes and utilities for the property (275 dollars per month) and further obligated to handle the maintenance and upkeep of the property. Fourth, and perhaps most revealing, the Schaefflers from time to time entered the property (two to three times a year) and these were not just social visits. As Judy Schaeffler testified at deposition, these visits were also to "check on the property and make sure everything's working right" and to ensure the property, including its fences, "was in a safe condition."[2]

This is all strong evidence the Schaefflers maintained a level of control over the property that is inconsistent with the legal premise that justifies limiting a landlord's duty of care. In fact, the summary judgment record supports a conclusion that the Mountjoys—living rent free, with an obligation to maintain the property for the Schaefflers, and subject to the Schaefflers' periodic inspection visits—were de facto caretakers of the property rather than tenants with a clear right to and interest in enforcing quiet enjoyment of the property exclusive of its familial owners. As even counsel for the Schaefflers conceded at oral argument, the Schaefflers would retain a nondelegable duty of care to third parties injured by a dangerous condition on the property if they hired an independent contractor to live there as

---

[2] Gary Schaeffler also testified at deposition that he would visually inspect the property, including its fences, every time he was present (including prior to the date of St. John's death) and he "made sure that the property has always been maintained . . . ." Gary Schaeffler further testified that it was "correct" that the Mountjoys were responsible, under the terms of their oral agreement, "to keep the property in a safe condition for [him] as the owner."

4

its caretaker.  (See generally *Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, 260.)  Functionally, the arrangement by which the Mountjoys came to the property is no different and the result—potential liability for the property owner—should accordingly be the same.

III

It is undisputed the Schaefflers knew the Mountjoys were raising pigs (and other animals) on the property and knew it was therefore imperative that the perimeter fencing be in good working order.  There is also evidence (not strong, but substantial enough) that would permit a factfinder to conclude the perimeter fence was in disrepair.[3]  On this record, and for the reasons I have just described, we should hold the Schaefflers owed a duty of care to St. John and require further proceedings to determine whether that duty was breached in a manner that proximately caused his death.

The majority rejects this view in three paragraphs of a 43-paragraph opinion.  The reasons given, which I discuss briefly, are not persuasive.  First, the majority concedes "the lease between the Schaefflers and the Mountjoys might not be an archetypical, arm's length lease between strangers,"[4] but the majority still believes the Mountjoys were tenants with full

---

[3]    The majority denies the existence of a material factual dispute just by waving off the pertinent expert testimony and related evidence on this point.

[4]    "Might not?"  This sort of begrudging language underscores the problem with the majority's viewpoint.  The lease is quite obviously not a typical arm's length lease between strangers.

5

control of the premises and interested in enforcing a right of quiet enjoyment. That is a fact-based conclusion inconsistent with the record on summary judgment. As I have explained, the full factual picture—including the lease, the parties' relationships, and the Schaefflers' own testimonial concessions—reveal a landlord that never ceded control of the property in the way that matters for the authority, which the majority itself reviews, that limits a landlord's otherwise existing duty of care.[5] Second, the majority agrees a landlord cannot divest itself of its duty of care by delegation to another but reasons "the undisputed facts . . . do not trigger that duty of care as to St. John." That is just wrong on the record, as I have already described.

By all appearances, the trial court's grant of summary judgment rests on an erroneous finding that the Schaefflers owed St. John no duty of care. I would therefore reverse the judgment and remand for further proceedings.

BAKER, J.

---

[5] Indeed, the features of the arrangement between the Schaefflers and the Mountjoys that I have highlighted are such that the Mountjoys would not need or want to object to the Schaefflers' retained elements of control.